1 F.3d 976
 Rilda I. BINGAMAN, Individually and as Administratrix of the
Estate of William L. Bingaman, Deceased, Plaintiff-Appellant,
v.
KANSAS CITY POWER & LIGHT COMPANY, a Missouri Corporation;
and Kansas Gas and Electric Company, a West
Virginia Corporation, Defendants-Appellees.
Kansas Department of Wildlife And Parks, Amicus Curiae.
 No. 92-3139.
 United States Court of Appeals,
Tenth Circuit.
 July 8, 1993.
 
 David A. Hoffman (Donald W. Vasos and Stephen G. Dickerson with him on the briefs), Vasos, Kugler & Dickerson, Kansas City, KS, for plaintiff-appellant.
 J. Michael Grier (James M. Warden and Diana D. Moore with him on the brief), Blackwell Sanders Matheny Weary & Lombardi, Overland Park, KS, for defendants-appellees.
 Before SEYMOUR, RONEY,* and MOORE, Circuit Judges.
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 Plaintiff Rilda Bingaman appeals the district court's summary judgment dismissal of her diversity-based wrongful death action. Bingaman v. Kansas City Power & Light Co., No. CIV. A. 88-2349-V, 1992 WL 81981 (D.Kan. Mar. 18, 1992). She contends the court erroneously concluded defendants were immune from liability under the Kansas Recreational Use Statute (KRUS), Kan.Stat.Ann. Secs. 58-3201 to -3207 (1983 & Supp.1992), which provides limited immunity to landowners who make their land available for public recreational use. We affirm in part and reverse in part.[1]
 
 I.
 
 2
 Defendants Kansas City Power & Light Company and Kansas Gas and Electric Company jointly own and operate the La Cygne Generating Station, a multi-unit electric generating facility in Kansas. They also own La Cygne Lake, the reservoir on which the power plant is situated, and the place where plaintiff's husband drowned.
 
 
 3
 At approximately 6:00 a.m. on July 2, 1986, Mr. Bingaman left his home to go to La Cygne Lake, where he often fished. Around noon, his capsized boat was found floating at the base of a weir located near the end of a discharge canal which runs parallel to the eastern shore of the lake. Although Mr. Bingaman's body was found the next day floating in the lake northwest of the weir, it appears he drowned in the weir.[2]
 
 
 4
 Plaintiff subsequently brought this action, seeking compensatory and punitive damages for defendants' alleged "negligence, or in the alternative, their malicious, wilful, wanton or recklessly indifferent conduct" in failing "to remove, correct, guard or warn against the unreasonably dangerous condition at the warm water discharge weir" which caused Mr. Bingaman's death. In their joint answer brief, defendants raised the KRUS as a complete defense to plaintiff's suit, claiming they were immune from liability as private landowners who had allowed the public to use their land for recreational purposes. The district court granted defendants' motion for summary judgment, and plaintiff appealed.
 
 
 5
 The central issue before us is whether the area in which Mr. Bingaman drowned was public recreational land within the meaning of the KRUS. Before resolving this issue, however, we must first review the broader context in which the drowning occurred, particularly as it relates to ownership of and control over the lake.
 
 
 6
 In 1968, after purchasing several tracts of land in Linn and Miami Counties, Kansas, defendants built a dam across North Sugar Creek, thereby creating La Cygne Lake. Defendants' power plant is located northeast of the dam, which forms the southern shore of the lake.[3] Along the eastern shore of the lake, defendants built a warm water discharge canal and canal dike running from the power plant to a point approximately two and a half miles north of the plant. The discharge canal carries cooling water which has circulated through the power plant's condensers to the northern part of the lake.
 
 
 7
 Approximately 150 feet south of where the discharge canal empties into the lake, defendants constructed a weir to keep a water seal on the cooling water discharged from the plant's condenser and to prevent the mass migration of fish upstream and into the condenser.[4] Just over a mile north of the power plant, between the plant and the weir, a canal pond approximately three quarters of a mile long juts out from the east side of the canal. The warm water discharge canal and weir are integral components of defendants' power plant.
 
 
 8
 In the late 1960s, defendants and the Kansas Fish and Game Commission[5] began discussing whether the lake and surrounding land could be opened for public recreational use. During negotiations, the Commission sought to gain public access to the entire lake, particularly the warm water discharge canal and canal pond. However, in November 1976, defendants informed the Commission that they "wanted no trespassing from the west end of the dam around the lake east and north to a point just beyond the weir on the east side."
 
 
 9
 On June 23, 1978, defendants and the Commission entered into an Easement Grant and Agreement (Easement Agreement) according the Commission a thirty-year public use/wildlife management easement over portions of La Cygne Lake. As described in Schedule D of the Easement Agreement, Easement Area II encompassed the discharge canal and weir.
 
 
 10
 However, portions of the lake designated as Easement Area II were subject to special terms and conditions. Specifically, Paragraph 4(a) of the Easement Agreement provided:
 
 
 11
 (a) The dam and dike structures shall remain the full responsibility of the [defendants] and they shall not be limited in any way in the maintenance or reconstruction of said facilities. With respect to the use of both sides of the discharge canal dike and the canal pond waters that are North of the center line of Sections 28 and 27, the Commission may permit access to same only if the Commission installs and maintains devices to clearly mark and prevent public entry into the canals and other areas deemed hazardous.
 
 
 12
 (emphasis added).
 
 
 13
 Thus, under that provision of the Easement Agreement, defendants retained full responsibility for the discharge canal and weir. More generally, defendants exercised a substantial degree of control over the entire land mass affected by the Easement Agreement, as compared to the Commission's "very limited" authority. However, the Commission did enforce state boating laws, including barring boaters from restricted areas.
 
 
 14
 Sometime before the lake was opened to the public, defendants installed three sets of "exclusion warning buoys" along the eastern side of the lake. First, at the end of the discharge canal north of the weir, they installed a wire rope and warning buoys marked with a "restricted area" symbol and the words "Keep Out." They also installed buoys north of the canal pond and south of the weir, and again south of the canal pond and north of the power plant.
 
 
 15
 After the lake was opened to the public, the Commission built a footbridge across the discharge canal south of the weir and north of the second set of rope-buoys to prevent boaters in the canal pond from floating down the canal and over the top of the weir. However, the footbridge fell into disrepair and was removed by the Commission before Mr. Bingaman drowned.
 
 
 16
 When Mr. Bingaman's death occurred, fishing and boating were allowed in the canal pond and canal waters between the second and third sets of rope-buoys. However, boating was not permitted in the discharge canal between the first and second sets of rope-buoys, including the weir area.[6] A few years after Mr. Bingaman's drowning, defendants installed a chain link fence running north from the top of the weir down to the water's edge. They also erected orange construction fencing and posted signs warning of a "severe undertow" both upstream and downstream of the weir. These actions effectively "boxed off" the weir area from all public access.
 
 II.
 A.
 
 17
 The KRUS was enacted "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." Kan.Stat.Ann. Sec. 58-3201.[7] Accordingly, a landowner who falls within the statute's ambit normally "owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes." Kan.Stat.Ann. Sec. 58-3203. Similarly,
 
 
 18
 an owner of nonagricultural land who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby: (a) Extend any assurance that the premises are safe for any purpose.
 
 
 19
 (b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.
 
 
 20
 (c) Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of such persons.
 
 
 21
 Kan.Stat.Ann. Sec. 58-3204 (emphasis added).[8]
 
 
 22
 There are, however, two exceptions to limited immunity provided by the KRUS. First, the statute does not "limit[ ] in any way any liability which otherwise exists ... [f]or willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." Kan.Stat.Ann. Sec. 58-3206(a). Second, landowners who charge a fee for public use of nonagricultural land are not immune from liability. Kan.Stat.Ann. Sec. 58-3206(b). Although plaintiff has invoked the "willful or malicious" exception as an alternate ground for recovery, it is undisputed that the public used defendants' land free of charge.
 
 
 23
 Applying the KRUS to plaintiff's wrongful death action, the district court ultimately concluded defendants were entitled to immunity from liability because of its findings that the weir area was open for public recreational use and that plaintiff failed to establish defendants' conduct toward Mr. Bingaman was willful or malicious. In so holding, the court first resolved that the weir area "constitute[d] a part of Easement Area II, as defined in Schedule D of the Easement Agreement, which pursuant to the terms of the Easement Agreement was intended to be open to the public for recreational use." Bingaman, 1992 WL 81981, at * 4. Consequently, although "the public was ultimately excluded from fishing and boating in the weir area because of safety reasons," this fact alone did not deprive defendants of immunity under the statute because "[t]here [was] no evidence ... that the public was discouraged from using the weir area for viewing and scenic enjoyment." Id. Moreover, the court found "it would run counter to the purpose of the statute to discourage landowners from attempting to protect the public from hazardous activities by refusing to provide immunity to a landowner who attempts to restrict the potential uses of certain lands." Id. Thus, in light of the stated purpose of the KRUS, the court ruled as a matter of law that defendants' actions in restricting certain recreational pursuits in the weir area did "not constitute a 'closing' of that area such that the Kansas RUS would not apply." Id.
 
 
 24
 Having concluded the weir area was public recreational land within the meaning of the KRUS, the court then considered plaintiff's contention that defendants nonetheless were not entitled to immunity because they willfully or maliciously failed "to guard or warn against a dangerous condition, use, structure, or activity." Kan.Stat.Ann. Sec. 58-3206(a). Relying on Klepper v. City of Milford, 825 F.2d 1440 (10th Cir.1987), the court determined "willful," as used in the KRUS, meant "intentionally causing an injury or doing wrong rather than intentionally acting or failing to act in a way that merely allows a wrong to occur." Bingaman, 1992 WL 81981, at * 5 (quoting Klepper, 825 F.2d at 1446). Thus, although defendants knew about the weir's undertow and were aware of at least one weir-related accident prior to Mr. Bingaman's drowning, the court concluded their knowledge alone was "insufficient to create liability under the Kansas RUS." Id. Finding plaintiff "presented no evidence that defendants intended to harm Mr. Bingaman," the court granted summary judgment for defendants on plaintiff's alternate claim. Id.
 
 
 25
 On appeal, plaintiff contends defendants' conduct both before and after executing the Easement Agreement "demonstrates that they exercised de facto control" over the weir and discharge canal. Indeed, she maintains defendants took "affirmative steps to bar public entry" to the weir area: regularly patrolling the area, removing the public, and installing a wire rope and "Keep Out" buoys just north of the weir. She also asserts that once the footbridge fell into disrepair, defendants controlled access to the canal dike through a locked gate, thereby preventing public access to the dike. Thus, according to plaintiff, "[n]o matter how defendants seek to characterize the installation of the wire rope and buoy[s], the totality of their actions clearly indicate [sic] that the public was neither invited or permitted to use the weir area in any manner." It follows, she maintains, that defendants are not entitled to immunity under the KRUS.[9]
 
 
 26
 "This court conducts a de novo review of a district court's ruling on summary judgment." United Bank & Trust Co. v. Kansas Bankers Sur. Co., 901 F.2d 1520, 1522 (10th Cir.1990) (citation omitted). We apply the same legal standard employed by the district court under Rule 56(c) of the Federal Rules of Civil Procedure, viewing the record in a light most favorable to the party opposing summary judgment. Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir.1991).
 
 B.
 
 27
 In determining the appropriateness of summary judgment, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Consequently, "[s]ummary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." Russillo v. Scarborough, 935 F.2d 1167, 1170 (10th Cir.1991). However, "summary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.
 
 
 28
 Having carefully reviewed the record before us on appeal, we believe the district court erroneously concluded as a matter of law that the KRUS applies to this case. Under the statute, a landowner must "directly or indirectly invite[ ] or permit[ ]" the public to use its property for recreational purposes to be immune from liability. Kan.Stat.Ann. Sec. 58-3204. Here, although the weir area technically may have been part of the Easement Agreement, the deposition testimony of the Linn County Sheriff and two security guards employed by defendants suggests that fishermen and boaters alike were routinely removed from the area.[10] Relatedly, defendants concede they took additional steps to keep the public out of the area, first installing exclusionary buoys and later fencing off the entire weir area.
 
 
 29
 Defendants' actions, when viewed as a whole, indicate they exercised a degree of control over the weir area inconsistent with their contention that the area was managed by the Commission pursuant to the Easement Agreement. Those actions also suggest that defendants intended to keep the public out of the weir area. When those actions are weighed against defendants' unsubstantiated claim that the area was used for viewing and scenic enjoyment, it is clear that the central factual issue in this case remains unresolved. Because plaintiff has raised a factual question whether the public was invited to use the weir area for any recreational purposes, the case must be remanded for further consideration.
 
 C.
 
 30
 In dismissing plaintiff's complaint, the district court relied upon two cases which are distinguishable. See Klepper, 825 F.2d 1440; Genco v. Connecticut Light & Power Co., 7 Conn.App. 164, 508 A.2d 58 (1986). In those cases, because the property on which the injury occurred was indisputably open to the public, the primary issues before the court were whether the defendants waived their immunity by posting warning signs on land otherwise protected by a state recreational use statute and, relatedly, whether the defendants failed to adequately warn against dangerously low water levels. The court in both instances ruled in favor of the defendants, concluding the applicable state recreational use statute did not prohibit landowners from restricting certain recreational activities on their land. See Klepper, 825 F.2d at 1450 (determining "sound public policy would encourage safety inspections and warnings by owners of recreational areas"); Genco, 508 A.2d at 61 (signs posted by defendants restricting use in certain locations on lake did not raise material factual issue where entire lake was considered major state recreational area).
 
 
 31
 Here, in contrast, the issue of public access to the weir area is far from resolved because the record contains evidence to support plaintiff's contention that the weir was closed to the public. Thus, the district court essentially resolved a disputed material fact contrary to Fed.R.Civ.P. 56(c) and concluded the weir area was open for certain recreational uses, thereby allowing Klepper and Genco to dictate a particular legal conclusion which does not necessarily follow from the highly controverted facts of this case.
 
 
 32
 The district court also failed to consider the legal effect of the special conditions imposed under the Easement Agreement for public access to the discharge canal north of the canal pond. Paragraph 4(a) of the Easement Agreement specifically allowed public "use of both sides of the discharge canal dike and the canal pond waters that are North of the center line of Sections 28 and 27" only if the Commission "install[ed] and maintain[ed] devices to clearly mark and prevent public entry into the canals and other areas deemed hazardous." Arguably, the footbridge served as the "condition precedent" for allowing such public access. Under the plain language of the Easement Agreement, one reasonably could conclude that when the footbridge was removed by the Commission, which occurred several years before Mr. Bingaman's death, the canal waters north of the canal pond ceased to be part of the easement. Thus, contrary to the district court's finding, it is debatable whether the weir area was included in the easement when Mr. Bingaman drowned.
 
 
 33
 A landowner who bars public access to its property has not directly or indirectly invited or permitted the public to use that property for recreational activities and thus is not entitled to immunity under the KRUS. Because we believe plaintiff has presented sufficient evidence to raise a genuine factual issue regarding public use of the weir area, we reverse the district court's order granting summary judgment and remand the case for further proceedings. In so doing, we note that if a jury ultimately concludes defendants did permit certain public recreational activities in the weir area, then this case would be governed by Klepper, and defendants would not be liable under the KRUS. However, should a jury find defendants denied public access to the area, the jury must then determine whether Mr. Bingaman was a trespasser under Kansas law.
 
 
 34
 Defendants contend "the legal result [is] the same" whether they permitted or prohibited public use of the weir area because they would owe no legal duty to an invited guest or trespasser other than to refrain from intentionally or recklessly injuring him. However, defendants have failed to consider a third, equally plausible scenario. If, as plaintiff argues, Mr. Bingaman had been fishing outside the weir area and defendants suddenly released more water into the discharge canal, thereby sucking Mr. Bingaman's boat into the weir, then Mr. Bingaman would be neither a trespasser nor an invitee.
 
 III.
 
 35
 Plaintiff has invoked the "willful or malicious" exception to the KRUS as an alternate ground for recovery. She contends that even if the weir area falls within the KRUS, defendants cannot escape liability because they willfully or maliciously failed to warn against the severe undertow associated with the weir. See Kan.Stat.Ann. Sec. 58-3206(a). To support her position, she recites a number of uncontroverted facts. First, she notes that before Mr. Bingaman drowned, defendants knew the weir created a dangerous undertow, experienced swimmers in good condition had been trapped in the weir, life jackets could not overcome the force of the circulating water, and the public perceived the weir area as a desirable fishing spot. She observes, moreover, that although defendants were aware of at least one drowning before Mr. Bingaman's death, they "gave no warning to the public that a deadly undertow could draw a boat into the weir, capsize it, and hold the occupant underwater." Therefore, she maintains defendants' failure to prevent Mr. Bingaman's drowning constitutes willful or malicious conduct under the KRUS.
 
 
 36
 Plaintiff also takes issue with the definition of "willful" articulated in Klepper. Claiming "the Supreme Court of Kansas would not interpret and apply Kansas law in a manner which would require proof that the instant defendants intended to harm Mr. Bingaman," she urges this court to both "modify Klepper to the extent it is inconsistent with decisions of the Kansas Supreme Court" and to remand this case for a jury determination whether defendants' conduct was willful or malicious.
 
 
 37
 In Klepper, we first considered the meaning of the term "willful" as employed by the KRUS. There, we determined that because "Kansas tort law overwhelmingly favors a definition of willfulness as intentionally causing an injury or doing wrong rather than intentionally acting or failing to act in a way that merely allows a wrong to occur," the defendants' conduct was not "willful" unless they "intended to injure the plaintiff or otherwise had a designed purpose or intent to do wrong. " 825 F.2d at 1446-47 (emphasis added). Thus, although plaintiff urges a less rigorous definition of "willful," Klepper is the controlling authority.
 
 
 38
 Applying Klepper to the facts of this case, we conclude plaintiff has failed to establish that defendants intended to injure Mr. Bingaman or to do wrong. To the contrary, defendants installed exclusionary buoys to keep the public out of the weir area even before the lake was opened to the public. Moreover, although defendants knew of a dangerous condition which had caused relatively few accidents, their knowledge alone is insufficient to create an inference that they intended to injure Mr. Bingaman.[11] Because the KRUS "provides for no liability for simple negligence," we affirm the district court's summary judgment dismissal of plaintiff's alternate claim. Id. at 1450.
 
 
 39
 For the foregoing reasons, the district court's order granting summary judgment is AFFIRMED in part and REVERSED in part.
 
 
 40
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 41
 PAUL H. RONEY, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 42
 I concur in the judgment of the court that the defendant was entitled to summary judgment insofar as plaintiff based her claim on allegations of willful and malicious misconduct.
 
 
 43
 I respectfully dissent from the decision that the alleged public restrictions in the weir area deprived the defendants of the protection provided by the Kansas Recreational Use Statute (KRUS), Kan.Stat.Ann. Secs. 58-3201 to 58-3207 (1983 & Supp.1992), for the reasons set forth in the Memorandum and Order of the district court as follows:
 
 
 44
 It is uncontroverted that pursuant to the Easement Agreement, La Cygne Lake was opened to the public for recreational use in 1978. Moreover, the discharge canal/weir area in which Mr. Bingaman's boat was found constitutes a part of Easement Area II, as defined in Schedule D of the Easement Agreement, which pursuant to the terms of the Easement Agreement was intended to be open to the public for recreational use. Easement Agreement paragraph 1. The fact that, when viewing the facts in the light most favorable to the plaintiff, the public was ultimately excluded from fishing and boating in the weir area because of safety reasons does not deprive defendants of the protection from liability provided by the Kansas RUS. See Genco v. Connecticut Light & Power Co., 7 Conn.App. 164, 508 A.2d 58, 61 (1986) (holding that the fact that defendant posted signs restricting the use of the lake in dangerous areas did not controvert the fact that the lake was open to the public).
 
 
 45
 In view of the stated purpose of the Kansas RUS to encourage landowners to make their lands available to the public for recreational uses, the court finds that restricting certain uses of an area does not constitute a "closing" of that area such that the Kansas RUS would not apply. There is no evidence in this case that the public was discouraged from using the weir area for viewing and scenic enjoyment, only that they were excluded from potentially hazardous activities such as boating and fishing. While the Kansas RUS states that landowners have no duty to warn of a dangerous condition, it would run counter to the purpose of the statute to discourage landowners from attempting to protect the public from hazardous activities by refusing to provide immunity to a landowner who attempts to restrict the potential uses of certain areas. Similarly, in Klepper v. City of Milford, Kansas, 825 F.2d 1440 (10th Cir.1987), the Tenth Circuit held that the defendant did not waive its immunity under the Kansas RUS because it made quarterly inspections of the park area and took steps to safeguard park users.
 
 
 46
 In the present case, the district court noted that sound public policy would encourage safety inspections and warnings by owners of recreational areas and that liability under the RUS for negligent undertakings could well have the effect of discouraging warnings and inspections altogether.
 
 
 47
 Id. at 1450. The court therefore concludes that the Kansas RUS applies to this case.
 
 
 48
 Bingaman v. Kansas City Power & Light Co., No. 88-2349-V, Op. at 9-10, 1992 WL 81981 (D.Kan. March 13, 1993).
 
 
 
 *
 Honorable Paul H. Roney, Senior Circuit Judge for the United States Court of Appeals for the Eleventh Circuit, sitting by designation
 
 
 [1]
 In light of our decision to remand the case for further proceedings, plaintiff's motions for certification to the Kansas Supreme Court and for leave to separately transmit a videotaped exhibit are denied
 
 
 [2]
 Defendants contend there is no evidence linking Mr. Bingaman's death to the weir. However, emergency personnel and others involved in the rescue operation, including one of defendants' own officials, uniformly reported that Mr. Bingaman drowned there, and defendants have presented no evidence or explanation to the contrary
 
 
 [3]
 See map attached
 
 
 [4]
 Defendants concede their weir is the type of low-head dam that creates one of the most dangerous water hazards in moving waterways. The rising water at its base creates a "boil" on the water's surface. Water then flows upstream towards the weir, creating a treacherous "backwash." It is further conceded that the extremely hazardous conditions associated with the weir are not known or understood by the public-at-large, including experienced fishermen, boaters, and swimmers, because the weir does not look dangerous
 
 
 [5]
 The Commission is now known as the Kansas Department of Wildlife and Parks
 
 
 [6]
 Viewing the facts in a light most favorable to plaintiff, the district court concluded fishing also was not allowed in the weir area. Bingaman v. Kansas City Power & Light Co., No. CIV. A. 88-2349-V, 1992 WL 81981, at * 3 (D.Kan. Mar. 18, 1992)
 
 
 [7]
 As defined in the statute, "land" refers to "land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty," including "agricultural and nonagricultural land." Kan.Stat.Ann. Sec. 58-3202(a). Correspondingly, the term "recreational purposes" includes, but is not limited to, "[h]unting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites." Kan.Stat.Ann. Sec. 58-3202(c)
 
 
 [8]
 Sections 58-3203 and 58-3204 of the KRUS also apply to "the duties and liability of an owner of land leased to the state or any subdivision thereof for recreational purposes." See Kan.Stat.Ann. Sec. 58-3205. Therefore, the disputed land in this case falls within the statute's purview
 
 
 [9]
 Plaintiff also suggests that because defendants would not be immune from liability if Mr. Bingaman had been killed inside the power plant, "[t]he result should not be any different solely because the locus of injury is outside the plant, in a man-made appurtenance necessary for operation of the plant." In light of our decision to remand the case, however, we need not consider the merits of plaintiff's "industrial complex" argument at this time
 
 
 [10]
 Defendants' attempts to discredit this testimony are unpersuasive because they have presented no evidence to support their contention that the public was allowed to use the weir area for "viewing and scenic enjoyment." Moreover, their opposing deposition testimony to the effect that fishing was allowed in the weir area at most raises a factual question whether certain recreational uses were indeed permitted
 
 
 [11]
 To date, only eight persons are known to have been trapped in the weir--two near-drownings and one drowning before July 1986 and four near-drownings after that date