**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 8 1997**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GLORIA HEYEN, as natural mother,
guardian, and next friend of Shawn Epp,
a minor, and/or Shawn Epp,

       Plaintiff - Appellant,

v.

COASTAL MART, INC.,

       Defendant - Appellee.

No. 96-3348
(D. Kansas)
(D.C. No. 95-CV-1284)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON**, **HENRY**, and **BRISCOE**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. See Fed. R. App. P. 34 (a); 10th Cir. R. 34.1.9. This cause is therefore ordered
submitted without oral argument.

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

Shawn Epp, by and through his mother, guardian, and next friend Gloria Heyen, filed suit against Coastal Mart, Inc. after he was stabbed by another customer in the company's Lyons, Kansas store. Plaintiff alleged that Coastal Mart's negligent security practices and failure to intervene contributed to the stabbing. Coastal Mart moved for summary judgment, arguing that it owed no duty to Mr. Epp as a matter of law. The district court granted Coastal Mart's motion and Plaintiff appeals. We affirm.

I.    BACKGROUND

Defendant Coastal Mart is a national chain of combination gas stations and convenience stores which are open twenty-four hours a day. The Coastal Mart in Lyons, Kansas, is located across the street from both the Rice County Sheriff's Department and the Lyons City Police Department. Irene Steele, the manager of the Lyons Coastal Mart, testified[1] that because of the store's proximity to the police departments, the police watch the area "very closely." Appellant's App. at 66. Ms. Steele and Chris Harris, the store's assistant manager, both testified that they did not know of any violence in the store during the several months that they worked in the store before June of 1993. Likewise, Plaintiff Heyen testified that she worked at Coastal Mart for eighteen months during 1991 and 1992 as a full-time, night-shift clerk, and during that period the only criminal incident involved a customer stealing a twelve-pack of beer.

---

[1]A number of witnesses testified at depositions.

Sergeant Sowers of the Lyons City Police Department testified that in the decade preceding June of 1993, he had been called to the store a number of times relating to criminal matters including gas skips, shoplifting, fights, and family disturbances. He testified that the police department had received "fight calls" from the Coastal Mart "occasionally." Appellant's App. Vol. II at 263. He approximated that there had been about ten to twelve incidents of family disturbances and fights per year at Coastal Mart. He described these incidents as something that "happens at Loves, at Sonic, at McDonald's. It's just a--unfortunately, people fight." Id. at 278. However, he testified that he did not know of any incident at Coastal Mart which involved a knifing, shooting, or assault with any other weapon. Steven Bundy, a Deputy Sheriff of Rice County in June of 1993, testified that Coastal Mart had "no history for being a habit of criminal activity." Appellee's Supp. App. at 72.

A number of times each year, community dances, what have been variously described as a "Mexican dances," "Spanish dances," or "Mexican wedding reception dances," are held in Lyons.[2] Ms. Steele testified that prior to June of 1993 these dances had never caused any problems at the Coastal Mart. Likewise, former Deputy Bundy testified that he could not remember any calls to the police department regarding problems at either of the convenience stores in town which "evolved from the dance." Id.. at 90. Nonetheless, Ms. Steele, Mr. Harris, and Sergeant Sowers acknowledged that

---

[2]For the purpose of convenience, we will refer to these dances as Spanish dances.

the potential for violence increases during public events, such as the Spanish dances, because of the number of people and because alcohol is available.

As manager of the store, Ms. Steele had instructed Mr. Harris that he should not hesitate to call the police if a person appeared suspicious or became violent. She also instructed him not to jeopardize his own life. The store was equipped with one or two security mirrors which gave the store clerk a better view of the store from the counter. The store was also equipped with a smoked glass bubble above the counter intended to cause the customers to believe they were being watched by a camera even though they were not. It is undisputed that these measures were the extent of security provided to respond to violence.

On the evening of June 12, 1993, a Spanish dance took place in Lyons. Ms. Steele testified that she was aware, from the Lyons daily newspaper, that there was to be such a dance in town that night. Because of the dance, Ms. Steele anticipated a greater volume of business that night and assigned Mr. Harris to work because he was the most competent employee. She believed that Mr. Harris was most qualified to handle the greater volume of business and handle any violence that might occur.

Mr. Epp testified that on June 12, 1993, he had about eight beers between 6:00 and 10:00 p.m. Then he and his friends, Mark and Joyce Hudson, went to a pool tournament for about two hours at a local bar. When they left the bar at about 1:00 a.m., they went to Coastal Mart so Mr. Epp could use the restroom and make a purchase and Ms. Hudson

-4-

could buy cigarettes. After the Hudson car pulled into the Coastal Mart parking lot, a second car pulled up next to them. Two of the occupants in the second car, Tony Mosqueda[3] and Jimmy Martinez, exited their car and, in doing so, one of them hit the car door against the Hudsons' car.

Mr. Hudson testified that after the car was hit, Mr. Epp was "giving [Mr. Mosqueda and Mr. Martinez] a hard time about--told them to watch it or something like that." Appellant's App. Vol. I at 250. Ms. Hudson testified that either Mr. Hudson or Mr. Epp made a comment after the car was hit, but that the comment could not be heard by Mr. Mosqueda or Mr. Martinez. However, it is undisputed that after the incident in the parking lot, Mr. Mosqueda and Mr. Martinez went into the store. Mr. Epp testified that he told the Hudsons that it was "bull" that one of the men had hit their new car and the Hudsons told him "to leave them alone, not to say nothing." Id. at 18. Mr. Hudson testified that he told Mr. Epp "not to go in there and start any trouble." Id. at 251. Then, Ms. Hudson and Mr. Epp went into the store.

There is some dispute about what, if anything, Mr. Mosqueda and Mr. Martinez said in the parking lot or in the store. Ms. Hudson testified that Mr. Mosqueda and Mr. Martinez were "cussing" as they got out of the car and that they "said something about fucking white people or something." Id. at 233-34. Mr. Epp, however, testified that he did not hear the men say anything or make any crude gesture. Mr. Harris testified that it

---

[3]This name is also spelled "Masqueda" in the record.

-5-

was possible that the store doors were propped open that night and if they were he could hear comments made in the parking lot. He also testified that if the men had made a comment as they were coming in the door, he would have heard it. However, Mr. Harris testified that from the time Mr. Mosqueda and Mr. Martinez walked into the store until the fight erupted, the only comments he heard them make were part of a conversation between themselves in Spanish, but that he did not understand Spanish. When further asked whether the men said "damn white people or something like that," Mr. Harris testified that to "the best of my memory they were not making those sort of comments." Id. at 189. However, Mr. Harris testified that because of the noise from the deli case and Icee machines, he could not hear someone speaking in the aisles or the back of the store unless the person spoke loudly. Ms. Hudson testified that Mr. Mosqueda and Mr. Martinez "were mouthing off the whole time they were in the store," and they were pointing and laughing, but that they were speaking in Spanish and she did not know what they were saying. Id. at 234. Ms. Hudson testified that Mr. Mosqueda and Mr. Martinez made her nervous because she "didn't like the way they looked." Id. at 235.

There is also some dispute about whether Mr. Mosqueda and Mr. Martinez appeared drunk. Mr. Hudson testified that Mr. Mosqueda and Mr. Martinez "somewhat" appeared as if they had been drinking. Ms. Hudson testified that they appeared as if they had been drinking because of the way they were acting, the way they were walking, and because they would "pick up some stuff and they would like drop it." Id. When asked at

his deposition whether the men looked like they had been drinking, Epp answered, "I really couldn't tell you. I don't know." Id. at 18. Mr. Harris testified that he was not close enough to determine whether they had alcohol on their breath and did not observe any demeanor consistent with intoxication. However, Mr. Harris testified that because there was a Spanish dance that night and because the men were Hispanic, he assumed they had been drinking.

Ms. Hudson made her purchases and returned to the car before the fight erupted. Ms. Hudson testified that as she was leaving the store she heard Mr. Mosqueda and Mr. Martinez, who were towards the back of the store, say to Mr. Epp "[s]omething about white boy . . . . It was like fucking white boy or something." Id. at 237.

Mr. Epp testified that when he went into the store, he went down the last aisle and "clear to the back" towards the bathroom. Id. at 19. Mr. Epp testified that when he walked by Mr. Mosqueda and Mr. Martinez on the way to the bathroom he asked them "what their problem was," id., and "what the deal was with them hitting the car with their car door." Id. at 20. In response, Mr. Mosqueda hit Mr. Epp with a "trench knife,"--that is, brass knuckles with an attached knife. That first blow resulted in the brass knuckles striking Mr. Epp on the side of the face and the knife cutting him on his head.[4] Mr. Epp

---

[4]There is some ambiguity in Epp's testimony. At one point he stated that the first blow resulted in him being hit with the brass knuckles and stabbed with the knife. See Appellant's App. Vol. I at 21-22. Later, in his testimony he stated that the first blow only resulted in him being hit with the brass knuckles. He then grabbed Mosqueda by the neck and Mosqueda began stabbing him. See id. at 39-40.

grabbed Mr. Mosqueda around the neck and Mr. Mosqueda then stabbed Mr. Epp twice on his left side and four times in the back. Mr. Epp grabbed Mr. Mosqueda's hand and told Mr. Martinez to take the knife from him. Mr. Martinez hesitated and then grabbed Mr. Mosqueda's hand. Mr. Epp ran out of the store, got in the Hudsons' car, and told them that he had been stabbed. He testified that the Hudsons thought he was joking. Mr. Epp testified that the police arrived "in seconds." Id. at 23. The police arrested Mr. Mosqueda and Mr. Martinez, and Mr. Epp was taken to the hospital in an ambulance.

Mr. Harris' version of events is slightly different. He testified that Mr. Epp entered the store first, asked him if the restroom was unlocked, and then went into the restroom for a minute or two. When Mr. Epp left the restroom, Mr. Mosqueda and Mr. Martinez entered the store. Mr. Harris testified that he did not pay much attention to the men and continued to visit with a customer, Sam Keller. Then he heard what sounded like a cooler door slamming and a commotion. He testified that he heard the slamming and commotion between five and fifteen minutes after the men entered the store. The commotion drew his attention towards the coolers at the back of the store where the three men were standing. He saw Mr. Epp, Mr. Mosqueda, and Mr. Martinez engaged in a fight in which Mr. Epp appeared to be defending himself against the other two men. Mr. Harris testified that he immediately called 911, advised the dispatcher that there was a fight, and requested an officer. Mr. Harris walked to the end of the counter and told the men to leave the store. Mr. Harris then saw that one of the men had a knife and was

stabbing Mr. Epp. Mr. Harris called 911 again and told the dispatcher to inform the officers that one of the men had a knife. He hung up the phone, walked to the end of the counter, and then the police arrived in the parking lot. Mr. Mosqueda, Mr. Martinez, and Mr. Epp all left the store. Mr. Harris identified the man with the knife for the police.

Ms. Steele and Mr. Harris testified that they did not know either Mr. Mosqueda or Mr. Martinez prior to the incident. Mr. Harris also testified that he did not eject the men or call the police prior to the fight because the men did not act suspicious.

Ms. Heyen filed suit on behalf of Mr. Epp contending that the Coastal Mart was negligent because it failed to provide more security to prevent foreseeable violent assaults, and because its agent Mr. Harris failed to intervene to prevent the assault on Mr. Epp. Coastal Mart moved for summary judgment and the district court granted the motion.

## II.    DISCUSSION

We review the grant of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed. R. Civ. P. 56(c). Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When

applying this standard, we examine the record and reasonable inferences therefrom in the light most favorable to the nonmoving party. Kaul, 83 F.3d at 1212.

There is no genuine factual dispute, and summary judgment may be granted, if there is a mere "scintilla of evidence" or if the evidence is "merely colorable or is not significantly probative." Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250-51 (1986)). "[T]he relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to jury or whether it is so one-sided that one party must prevail as a matter of law." Bingaman v. Kansas City Power & Light Co., 1 F.3d 976, 980 (10th Cir. 1993) (quotation omitted).

With this standard in mind, we turn to Kansas law to analyze Plaintiff's substantive claims.

### A. Failure to Provide Security to Prevent a Foreseeable Attack

Under Kansas law, the "owner of a business is not the insurer of the safety of its patrons or customers," and the "owner ordinarily has no liability for injuries inflicted upon patrons or customers by the criminal acts of third parties." Seibert v. Vic Regnier Builders, Inc., 856 P.2d 1332, 1338 (Kan. 1993). "Such a duty may arise, however, where circumstances exist from which the owner could reasonably foresee that its customers have a risk of peril above and beyond the ordinary and that appropriate security

measures should be taken." Id. In determining whether risk of criminal violence is foreseeable, we must apply the reasonable person standard and consider the totality of the circumstances. Id. at 1339. The circumstances to be considered include prior incidents of criminal violence, whether the business is located in a known high crime area, and any other circumstances that "have a direct relationship to the harm incurred in regard to foreseeability." Id.

Whether the risk of harm is reasonably foreseeable is ordinarily a question of fact. Gragg v. Wichita State University, 934 P.2d 121, 133 (Kan. 1997); Nero v. Kansas State University, 861 P.2d 768, 779 (Kan. 1993). Only when reasonable persons could arrive at one conclusion may the court determine the question of foreseeability as a matter of law. Gragg, 934 P.2d at 133; Nero, 861 P.2d at 779.

Plaintiff argues that the attack on Mr. Epp was reasonably foreseeable such that Coastal Mart was negligent in failing "to interview Chris Harris to determine his security ability and background and training, and to give him further training," Appellant's Br. at 24, and failing "to have better security systems in place." Id. at 34. Construing the facts in favor of Plaintiff and considering the totality of the circumstances in this case, we agree with the district court that no reasonable jury could find that the attack on Mr. Epp was reasonably foreseeable such that Coastal Mart was charged with a legal duty to provide greater security than it had been providing. See Gragg, 934 P.2d at 135.

-11-

First, the incidents of violence at Coastal Mart prior to June of 1993 were not extraordinary and did not include assaults with weapons. Ms. Steele and Mr. Harris testified that they did not know of any violent incidents at the store during the several months that they had worked in the store prior to the stabbing. Plaintiff Heyen also testified that she did not know of any violent incidents at the store during the eighteen months that she worked the night shift at the store during 1991 and 1992. Sergeant Sowers testified that there had been approximately ten to twelve incidents of family disturbances and fights per year at Coastal Mart. However, he described these incidents as the ordinary sort of fights that occur at a number of stores in town. He also testified that he did not know of any fight at Coastal Mart involving a knifing, shooting, or assault with any other weapon.

Second, there is no evidence that Coastal Mart was located in a known high crime area. There was evidence that Coastal Mart was located in a commercial district frequented by a high volume of people. However, there was no evidence that this location resulted in high crime. In fact, it is undisputed that Coastal Mart was located across the street from two police departments and Ms. Steele testified that the police watched the area closely.

Finally, the only other circumstance which Plaintiff relies on to show foreseeability is the fact that a Spanish dance was scheduled to take place near the Coastal Mart. However, this circumstance has little "direct relationship to the harm incurred in regard to

foreseeability." Seibert, 856 P.2d at 1339. Ms. Steele, Mr. Harris, and Sergeant Sowers acknowledged that the potential for violence increases during public events, including Spanish dances, because of the number of people and because alcohol is available. Nonetheless, Ms. Steel testified that prior to the stabbing these dances had never caused any problems at Coastal Mart and former Deputy Bundy testified that as far as he knew these dances had not caused any problems at either of the convenience stores in town.

The only further arguments Plaintiff makes are (1) that Ms. Steele[5] and Mr. Harris[6]

---

[5]Ms. Steele's testimony on this point is as follows:

Q. Chris Harris testified awhile ago that it was foreseeable that a violent event would occur in the Coastal Mart on a night such a Mexican dance would take place, which was--that was the night it took place in this case. My question for you, ma'am, is, do you agree with his testimony in that regard?
A. No. I do not.
Q. Why do you say that you do not believe that it was foreseeable that a violent event would occur in the Coastal Mart on the night of a Mexican dance?
A. There were many dances out at the Ag Building with Mexican that we-- that never caused any problems.
* * *
Q. Was it your practice to assign on those higher possible volume of business days because dances would take place in Lyons someone more competent not only to handle the higher volume of business but also to be able to protect against instances of violations of law in the Coastal Mart store?
A. Yes.
Q. Did you keep in mind when you were assigning those persons for these higher volumes of business times violations of law not only of shoplifting but also possibly of violent incidents?
A. Yes.
Q. And was that part of what you kept in mind when you assigned Chris to the store that particular night, so that he would be able to protect against shoplifting as well as possibly any violent incident that could occur because of higher volume of traffic of people?
A. Yes, I believe I do. I did.
* * *
Q. So in that sense you were attempting to look into the future to foresee whatever violent incident might take place because there would be more people there for the dance and to be able to protect against it by having Chris there, and to be able to--
A. Yes.
Q. For purposes of security of the store, true?
A. True.

-14-

admitted that the stabbing was foreseeable and that Sergeant Sowers[7] testified that the

_____

Appellant's App. Vol. I at 67, 69-71.

[6]Mr. Harris' testimony on this point is as follows:

Q. All right. Now, would you agree with me, though, that when those Mexican dances are happening that the potential for violence in the Lyons area, particularly in the highly traveled commercial area, is greater?
A. Yes, sir.
Q. And it's foreseeable that violent events could occur on the--
Q. Would you agree with me, sir, that when a Mexican dance like that is happening that it is foreseeable that a violent event could occur in a place like the Coastal Mart in Lyons?
A. I'd clarify that yes, it is--it is foreseeable, but I also think it's foreseeable, whether it's a Mexican dance or anything else, where a large amount of alcohol is served freely that the potential for violence increases.
Q. And the Mexican dances do have freely served alcohol when they're occurring, is that right?
A. I've never been to one so I'm not sure how they bring it in or whether it's--whether they tap a keg, so to speak, or whether it's BYOB type situation, but previous experience, yes, there is a lot of alcohol.
Q. Previous to that night you'd had experience with that?
A. Yes, sir, previous to that night.

Appellant's App. Vol. I at 223-24.

[7]Sergeant Sowers' testimony on this point is as follows:

Q. And is it true that the probability of a violent event happening in a place such as Coastal Mart in Lyons on a night like a Mexican dance is increased from a normal night because of the increased activity?
A. Not because of the Hispanic dance. We generally don't have too much problem out of them.
Q. I guess I don't mean to be--I don't want to sound as if I am implying any kind of racial discrimination.
A. Okay.
Q. Let me just rephrase my question. Is it true that on the night of a public event, whether it would a Mexican dance or an Anglo dance or just any kind of a public event, but a dance involving liquid refreshments--because they

-15-

stabbing was foreseeable, and (2) that Plaintiff's expert witness' report states that the

stabbing was foreseeable. As for the first argument, Plaintiff argues that these witnesses

were specifically asked, in one form or another, whether violence was "foreseeable," and

each witness agreed. However, viewing the testimony in the light most favorable to the

Plaintiff, Ms. Steele only admitted that the possibility of violence increased on nights

when special events resulted in a higher volume of customers patronizing Coastal Mart.

Likewise, Mr. Harris and Sergeant Sowers admitted that the possibility of violence

increased on nights when special events involved consumption of alcohol. Counsel's

---

do have alcohol at that dance, is that right?
A. That's correct.
Q. Okay. So would it be true on the night of such a dance involving alcoholic refreshments there at the extension building that the probability of a violent event occurring at the Coastal Mart would increase because it's the closest convenience store to the dance? I mean based on your normal experience, the probability?
A. Any time you have liquid refreshment, as you put it, you are going to have a probability of fights. I mean that's just the way it is and that's the cause of most of them.
* * *
Q. Let me make sure I know your answer. Is your answer to my question that the probability of a violent event occurring at either one of the convenience stores in Lyons would increase on the night of a public dance such as that which involves alcoholic refreshment?
A. That would be correct.
Q. Based on your actual experience?
A. Yes, sir.
Q. So it's foreseeable that a violent event could occur at the Coastal Mart or the other convenience store on a night such as a Mexican dance.
A. That's correct.

Appellant's App. Vol. II at 280-82.

questions about foreseeability were nothing more than an attempt to create a case that survives summary judgment by asking lay persons to render what are either essentially legal opinions or pure speculation. These admissions fall far short of admitting that violence was so foreseeable that in this case a reasonable proprietor would have provided greater security.

As for the report from Plaintiff's expert witness, the opinion contained in that report is wholly deficient. Dr. John H. Lombardi's report contains the conclusory statement that the "attack on Shawn Epp was foreseeable." Appellant's App. Vol. II at 373-2. The report then makes the additional conclusory statements that the security at Coastal Mart was inadequate to address foreseeable violence and that the inadequate security caused Mr. Epp's injuries. The report does not attempt to address the Seibert factors and provides no support for Plaintiff's case. See Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations.")

In short, we conclude that there is not sufficient disagreement to submit to the jury regarding whether it was reasonably foreseeable that Coastal Mart customers had a risk of peril above and beyond the ordinary. The evidence is so one-sided that Coastal Mart must prevail as a matter of law.

### B. Failure to Intervene

Even if violent attacks are not generally foreseeable such that a reasonable proprietor would provide greater security to prevent such attacks, a proprietor has a duty to protect a patron during a particular attack if there is a "sequence of conduct sufficient to enable him to act on behalf of his patron's safety." Gould v. Taco Bell, 722 P.2d 511, 516 (Kans. 1986) (quoting Kimple v. Foster, 469 P.2d 281 (1970)). The "duty of a proprietor . . . to protect his patrons from injury does not arise until the impending danger becomes apparent to him, or the circumstances are such that a careful and prudent person would be put on notice of the potential danger." Id. at 512 (syllabus of court).

There is no dispute that as soon as Mr. Harris heard what sounded like a cooler slamming and a commotion, he looked up and saw the men fighting and immediately called the police. There is also no dispute that he then told the men to leave, and when he saw the knife he called 911 again to update dispatch that a knife was involved. However, Plaintiff contends that there is sufficient evidence to prove (1) that prior to the fight Mr. Mosqueda and Mr. Martinez engaged in a sequence of conduct sufficient to put a reasonable person on notice of impending danger and that Mr. Harris was negligent in failing to eject them or calling the police to do so, and/or (2) that once the fight began Mr. Epp and Mr. Mosqueda exchanged punches before Mr. Mosqueda stabbed Mr. Epp, and Mr. Harris was negligent in failing to notice the fight sooner and intervene before the stabbing occurred.

First, Plaintiff asserts that Mr. Harris failed "to eject two obviously drunk and cursing and agitated Hispanic customers" and prevent the fight before it began. Appellant's Brief at 8. Accordingly, we must examine the evidence regarding what, if anything, Mr. Harris saw and heard prior to the fight erupting, and whether such clues would cause "a careful and prudent person [to] be put on notice of the potential danger," Gould, 722 P.2d at 516, and intervene.

The only evidence regarding Mr. Mosqueda's and Mr. Martinez's behavior at the Coastal Mart prior to the fight is (1) the testimony that when the men exited their car, the car door hit against the Hudsons' car; (2) Ms. Hudson's testimony that when the men got out of their car they were "cussing" and "said something about fucking white people or something"; (3) Mr. Harris' testimony that the men spoke to each other in Spanish while in the store; (4) Ms. Hudson's testimony that the men were "mouthing off" in Spanish and pointing and laughing while in the store; (5) Ms. Hudson's testimony that the men made her nervous because she "didn't like the way they looked"; (6) Mr. Hudson's testimony that the men "somewhat" appeared as if they had been drinking, and Ms. Hudson's testimony that they appeared as if they had been drinking because of the way they were acting and walking and because they would "pick up some stuff and they would like drop it"; and (7) Ms. Hudson's testimony that as she was leaving the store she heard the men say "fucking white boy or something" to Mr. Epp. Mr. Harris denies seeing the car door hit the Hudsons' car, hearing Mr. Mosqueda and Mr. Martinez make any crude racial

-19-

comments or any other comments in English, or observing any conduct suggesting the men were intoxicated.

Whether or not there is sufficient evidence that Mr. Harris observed any or all of these alleged instances of ill behavior on the part of Mr. Mosqueda and Mr. Martinez is a close issue. Fortunately, we need not determine whether a reasonable jury could make such findings. Even assuming that Mr. Harris was aware of this behavior, we hold that a reasonable jury could not conclude that such behavior would put a careful and prudent person on sufficient notice of potential danger, such that a reasonable proprietor would eject Mr. Mosqueda and Mr. Martinez or call the police.[8]

First, even if Mr. Harris saw the car door hit the Hudsons' car, there was no evidence that it was done intentionally and, thus, is not indicative of violence. Second, even though Ms. Hudson testified that she heard the men make a crude racial comment as they were getting out of their car, she did not indicate whether the comment was made loudly, belligerently, or whether it was a comment shared between the men or directed at a third person. In fact, neither Mr. Epp nor Mr. Hudson, who were in the parking lot, heard the comment. Likewise, even though Ms. Hudson testified that she heard the men

---

[8]The Plaintiff also contends that Mr. Harris "negligently allowed himself to be distracted by Mr. Sam Keller . . . and did not take the time during the ample 15 minutes that he had available to him, to eject the Hispanic individuals from the sore [sic]." Appellant's Br. at 19. However, because we conclude that the alleged ill behavior on the part of Mr. Mosqueda and Mr. Martinez was not enough to cause a reasonable store clerk to eject the men or call the police, we do not reach the issue of whether Mr. Harris was so distracted by Mr. Keller that he did not observe the behavior.

make a similar crude racial comment to Mr. Epp while she was leaving the store, she did not indicate whether it was loud or belligerent, and though she stated that the comment was made to Mr. Epp, Mr. Epp did not hear it. Ms. Hudson also did not indicate whether the statement was made sometime before the fight erupted or as the fight erupted. In short, while the comments, if made, were certainly abhorrent, they do not suggest that the men were likely to attack a store patron. Likewise, Mr. Hudson's and Ms. Hudson's testimony that the men may have been drunk, absent any testimony that the men were behaving violently, does not indicate that violence was likely. Finally, Ms. Hudson's testimony that the men were "mouthing off" in Spanish, that they were pointing and laughing while in the store, and that they made her nervous because she did not like the way they looked is of no or little relevance in determining whether the men were likely to attack a patron.

Plaintiff also argues that there is sufficient evidence for a jury to find that the "the stabbings could have been prevented by stopping the fight earlier," Appellant's Br. at 25, because there was an interval of time after the fight started in which Mr. Epp and Mr. Mosqueda exchanged punches with their fists. Plaintiff contends that Mr. Harris was negligently distracted by another customer, Mr. Keller, such that he did not notice the fight and did not call the police until sometime after the fight had begun.

Of course, this theory is contrary to Mr. Epp's version of the encounter. He testified that the altercation in the store began when Mr. Epp asked "what the deal was

-21-

with them hitting the car with their car door," Appellant's App. Vol. I at 20, and in response Mr. Mosqueda hit him with the trench knife--a weapon which is a combination brass knuckles and knife. Mr. Epp testified that either (1) Mr. Mosqueda hit him once with the brass knuckles, Mr. Epp grabbed Mr. Mosqueda around the neck, and then Mr. Mosqueda began stabbing him, or (2) the first blow from Mr. Mosqueda resulted in him hitting Mr. Epp in the face with the brass knuckles and cutting him in the head with the knife and was followed by more stabbings.[9] However, Plaintiff contends that the jury may disbelieve Mr. Epp's testimony that the fight began with immediate or almost immediate stabbing.

The only contrary evidence is Mr. Martinez's written statement to the police which states that while in the store Mr. Epp was bumping into Mr. Mosqueda, Mr. Epp told Mr. Mosqueda "not to fuck with him," and then Mr. Epp swung at Mr. Mosqueda first. Mr. Martinez's statement then explains that two or three blows were exchanged between the men, the men "locked on to each other," and then Mr. Epp hit Mr. Mosqueda three or four more times before Mr. Mosqueda stabbed Mr. Epp. Id. Vol. II at 333-34.

However, even if a jury disbelieved Mr. Epp's testimony that the fight began with immediate or almost immediate stabbing and believed Mr. Martinez's statement to police that there were several punches before the stabbing began, no reasonable jury could conclude that Mr. Harris had a duty to notice the first few moments of the fight. Under

---

[9]There is some ambiguity in Mr. Epp's testimony. See supra n.4.

every version of events, the fight erupted and ended quickly. There was not a "sequence of conduct sufficient to enable [Mr. Harris] to act on behalf of his patron's safety." Gould, 722 P.2d at 516. To hold Coastal Mart liable for Mr. Harris' alleged failure to notice the first few moments of the fight would be to make Coastal Mart the insurer of its customers' safety.


## III. CONCLUSION

For the above reasons, we AFFIRM the district court's order and judgment.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge