FILED
United States Court of Appeals
Tenth Circuit

September 7, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHRISTIE HELM,

      Plaintiff - Appellant,

v.

STATE OF KANSAS,

      Defendant - Appellee.

No. 10-3092

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:08-CV-02459-JAR)**

---

Lynne Jaben Bratcher, Bratcher Gockel & Kingston, L.C., Kansas City, Missouri, for Plaintiff-Appellant.

Teresa L. Watson (David R. Cooper and Terelle A. Mock with her on the brief), Fisher, Patterson, Sayler & Smith, L.L.P., Topeka, Kansas, for Defendant-Appellee.

---

Before **KELLY**, **EBEL**, and **GORSUCH**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

      Plaintiff-Appellant Christie Helm appeals from the district court's order granting

summary judgment in favor of the State of Kansas on her claim for sexual harassment

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. Helm sued the State after she was allegedly sexually harassed over a period of almost ten years by Judge Frederick Stewart, a state district judge for whom Helm served as an administrative assistant. The district court determined that the State was entitled to summary judgment because Helm fell within the "personal staff" exemption to Title VII's definition of "employee" and thus did not qualify for the protections afforded by the statute. See id. § 2000e(f). Alternatively, the court ruled that summary judgment for the State was proper on the basis of the Faragher/Ellerth affirmative defense to employer liability for a supervisor's sexual harassment of a subordinate. See Faragher v. City of Boca Raton, 524 U.S. 775, 807–08 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764–65 (1998). Exercising jurisdiction under 28 U.S.C. § 1291, we hold that the Faragher/Ellerth defense precludes vicarious liability against the State of Kansas for Judge Stewart's alleged actions. Accordingly, we AFFIRM the judgment of the district court without reaching the question whether the "personal staff" exemption removes Helm from the purview of Title VII. We also DENY both parties' motions to seal certain volumes of their respective appendices.

## I.  BACKGROUND

### A.  Judge Stewart's Alleged Sexual Harassment of Helm[1]

---

[1] For purposes of summary judgment, we take as true Helm's account of Judge Stewart's conduct.

Continued . . .

In September 1998, Christie Helm was hired to fill an administrative-assistant position shared between Judge Frederick Stewart and Judge Robert Bednar in the First Judicial District of Kansas (the "First Judicial District").[2]  At that time, Judge Stewart had served as a district judge for more than twenty years, while Judge Bednar was beginning his first year on the bench.  Judge Stewart began sexually harassing Helm shortly after she was hired.  For several years, the harassment primarily involved touching Helm's rear end, thighs, and legs.  Additionally, in 1999, Judge Stewart forced a kiss on Helm in front of the courthouse.

Helm took a medical leave of absence during the spring and early summer of 2006.  After Helm returned to work, Judge Stewart started touching her inappropriately again.  During the spring of 2007, the harassment began to escalate.  Throughout March and April, Judge Stewart would regularly close the door of his office and kiss Helm.  In addition, he once put his hands up Helm's skirt.  In late May or early June 2007, Judge Stewart put his hands up Helm's skirt and penetrated her vagina with his finger.  He also told her that he wanted to have sex with her on the couch in his chambers and make her have an orgasm.  In June 2007, Judge Stewart unbuttoned Helm's blouse on two different occasions and fondled her breasts.

_____
Cont.

[2] Helm also assisted a part-time judge, Patrick Reardon, after he was appointed in 2002.

**B.     The First Judicial District's Sexual Harassment Policy**

The First Judicial District has adopted the sexual harassment and discrimination policy formally promulgated by the Kansas Judicial Branch in the Kansas Court Personnel Rules (the "Rules"). The sexual harassment policy prohibits sexual harassment, defines the proscribed conduct, details how and to whom employees should make a sexual harassment complaint, explains the complaint investigation process, and includes an anti-retaliation provision. Under the policy, the court administrator is responsible for receiving complaints of sexual harassment (either from the victimized employee or from the supervisor to whom the employee complained), notifying the Office of Judicial Administration (the "OJA"), and coordinating a response with the OJA. When the allegations involve a judge, the OJA works with the Kansas Commission on Judicial Qualifications (the "KCJQ") to conduct an investigation.

The Kansas Judicial Branch Employee Handbook (the "Handbook") contains a section regarding the First Judicial District's sexual harassment policy. That section provides, in part, as follows:

> An employee who believes he or she has been subjected to unlawful harassment should bring the concern to the immediate supervisor, appointing authority, or the Director of Personnel. Employees will not be retaliated against for making a sexual harassment complaint. All complaints are taken seriously and a confidential investigation will be conducted promptly.

(Aplt. App., vol. II at 248.) All court employees receive a copy of the Handbook and are required to submit an acknowledgment form indicating that they have read and

4

understand the policies contained therein. Helm received a copy of the Handbook, read through it, and signed the acknowledgment form.[3] She kept a copy of the Handbook in her desk drawer at work.

The First Judicial District provides sexual harassment training to management-level employees but does not provide such training to non-management employees like Helm. It disseminates the sexual harassment policy to non-management employees only via the Handbook and the Rules.

## C.   Helm's Complaints About Sexual Harassment and the First Judicial District's Response

Between 2003 and 2007, Helm complained to a coworker, Karen Connor, about Judge Stewart on approximately ten different occasions. She never mentioned specifics, stating only that Judge Stewart made her uncomfortable. In late June or early July 2007, Helm approached the chief judge of the First Judicial District, David King, and told him that Judge Stewart had done something inappropriate and made her feel uncomfortable. She did not disclose any details. Chief Judge King told Helm that no one should work under those circumstances and advised her of the procedure for making a complaint. He also told her that if she wished to make a complaint, the First Judicial District "would stand beside and support her fully and that there would be no consequence to her as a result of making the complaint." (Aplt. App., vol. VI at 1150.) Helm said that she

---

[3] In her summary-judgment affidavit, Helm nevertheless avers that she did not know about the First Judicial District's sexual harassment policy.

5

wanted to think about whether to make a complaint, and Chief Judge King responded, "Well, don't take too long, because if you don't do anything, I'm going to have to do something since you've conveyed this to me." (Id.) In addition, Chief Judge King commented that the "matter would take on a life of its own that [Helm] wouldn't be able to control" once an investigation began. (Id. At 1157)

Helm came back to Chief Judge King the same day and said that she had resolved the matter with Judge Stewart and did not wish to pursue it further.[4] Chief Judge King relayed his conversation with Helm to Steven Crossland, the court administrator, but neither King nor Crossland made a report to the OJA. In his deposition, Chief Judge King explained that Helm's decision not to pursue her complaint after he explained the process to her led him to believe that maybe there was not really a problem. He also stated, "[I]f I had given credit to her complaint and if I had assumed that she had been the victim of sexual harassment, it would not have been a matter of her choice of reporting it. But she didn't give any details." (Id.)

In July 2007, Helm requested medical leave so that she could seek treatment for alcohol and drug abuse. She was given permission to take unpaid leave under the Family

---

[4] Helm claims in the background section of her opening brief that Chief Judge King's statement about the matter taking on a life of its own discouraged her from making a complaint, but she cites no portion of the record to support that assertion. Nor does she raise that argument in the section of her brief addressing the reasonableness of the State's efforts to prevent and correct sexual harassment. Consequently, we give no weight to that assertion in Helm's brief.

Medical Leave Act after she exhausted her sick leave and vacation. During the month of July, Helm received inpatient treatment at an alcohol and drug rehabilitation facility.

On August 8, 2007, before Helm was scheduled to return to work, she reported to Judge Bednar that Judge Stewart had sexually harassed her. This was the first time that she had made any mention of the issue to Judge Bednar. Helm told Judge Bednar that the harassment was "basically verbal, but it had gotten to touching or had involved touching." (Id. vol. II at 120.) She also informed Judge Bednar about her previous conversations with Chief Judge King.

Judge Bednar immediately reported Helm's complaint to Chief Judge King and Steven Crossland. Judge Bednar also told Judge Stewart about the complaint. According to Judge Stewart, Judge Bednar opined that Helm was making the claim simply because she was after money. Crossland notified the OJA of the complaint later that same day. At that time, Crossland believed that Helm would return to work on August 13, 2007, and he planned to talk to her and Chief Judge King on that day about changing her duties so that she would not have to work for Judge Stewart anymore.

Helm did not return to work on August 13. On August 21, 2007, Mike Helm, Christie Helm's husband, contacted Crossland about his wife's job status. The Helms were concerned because Christie had received smaller paychecks and then no paychecks during her leave of absence. Later that day, Crossland met with the Helms and explained that the change in pay was because of Christie Helm's exhaustion of sick leave, not because her job was in jeopardy. Crossland also raised the issue of Helm's sexual

7

harassment complaint against Judge Stewart, stating that sexual harassment would not be tolerated and that the complaint would be investigated regardless of whether she submitted a formal written complaint. Crossland testified that he then assured Helm that they would discuss changing her duties upon her return to work, although Helm testified that she does not remember that part of the conversation.

At some point after Crossland relayed Helm's complaint to the OJA—the record is unclear as to the exact date—the KCJQ initiated an investigation into Helm's allegations against Judge Stewart. Helm testified before the KCJQ on September 17, 2007.

## D.    Helm's Arrest and Termination

On September 18, 2007, Helm was arrested following an altercation with her husband. She was charged with aggravated battery, a felony, and domestic battery and disorderly conduct, both misdemeanors. Helm ultimately entered into a diversion agreement that included her stipulation to facts that satisfied the elements of the three charged offenses.

On December 3, 2007, Chief Judge King sent Helm a letter informing her that the conduct to which she admitted violated three provisions of the Rules. He further explained that her decision to enter into a diversion on a felony charge disqualified her from accessing defendants' criminal histories under the rules established for the Kansas Criminal Justice Information System. This precluded her from carrying out her duties as an administrative assistant. Chief Judge King also wrote that Judge Stewart had removed

8

himself from any employment decisions concerning Helm and that Judge Bednar had delegated the authority to make such decisions to Chief Judge King. Accordingly, Chief Judge King proposed termination of Helm's employment and gave Helm the opportunity to respond.

Helm responded in a letter dated December 7, 2007. She provided a number of reasons why she should be allowed to continue working for the First Judicial District, including the fact that Ron Chance, the court administrator who preceded Crossland, had entered into a diversion on a DUI charge and had not been fired. Helm suggested that her criminal prosecution and the proposed termination represented retaliation for her complaining about Judge Stewart's sexual harassment.

One week later, Chief Judge King wrote Helm back and informed her that she was terminated effective immediately. He rejected Helm's attempt to compare her situation to Chance's, explaining that Helm was the only employee that he knew of who had admitted to facts constituting a felony offense against another person. He also addressed Helm's retaliation argument:

> Your contention that your termination is in retaliation for your assertion of a claim of sexual harassment is completely without merit. The district court administration, and not you, submitted your complaint to the [KCJQ] through the [OJA]. It was you who were reluctant to pursue a complaint against Judge Stewart, notwithstanding our assurances to you that there would be no adverse employment consequences for you doing so, and our assurances that you would be supported through the process by the district court administration. . . .
>
> . . . .

9

Simply put, the decision to propose termination of your employment was based exclusively on your admitted criminal misconduct and nothing else. Absent such misconduct, termination of your employment would not have been proposed.

(Aplt. App., vol. III at 397.)[5]

### E.    KCJQ Disciplinary Proceedings Against Judge Stewart

On June 3, 2008, the KCJQ filed a Notice of Formal Proceedings against Judge Stewart. In October 2008, however, Judge Stewart retired from the bench and moved to Alabama. Consequently, the KCJQ closed the investigation.

### F.    Procedural History

On January 22, 2008, Helm filed a Charge of Discrimination against the State of Kansas with the Equal Employment Opportunity Commission (the "EEOC"). She alleged sexual harassment and retaliatory discharge in violation of Title VII. On June 27, 2008, the EEOC dismissed the charge with the comment, "No jurisdiction, no employer – employee relationship." (Aple. Supp. App., vol. II at 1564.)

Helm then filed her claims in federal district court. Early in 2009, the parties filed cross-motions for summary judgment. Helm sought partial summary judgment on the issue of whether she qualified as an "employee" under Title VII, while the State sought summary judgment on both of Helm's claims. In an order dated March 17, 2010, the district court denied Helm's motion for partial summary judgment and granted the State's

---

[5] In his deposition, Crossland similarly represented that Helm would have been allowed to continue her employment with a different judge or in a different office if not for her arrest and diversion.

motion for summary judgment. The court first ruled that Helm was not an "employee"

protected by Title VII because she served on the "personal staff" of both Judge Stewart

and Judge Bednar. Furthermore, the court determined that even if Helm did qualify as an

"employee" for Title VII purposes, the State was entitled to summary judgment on

Helm's sexual harassment claim on the basis of the Faragher/Ellerth affirmative defense.

Helm now appeals the district court's grant of summary judgment in favor of the

State on her sexual harassment claim.[6]

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the

same standard as the district court. Duvall v. Ga.-Pac. Consumer Prods., L.P., 607 F.3d

1255, 1259 (10th Cir. 2010). Summary judgment is appropriate "if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, a defendant moves

for summary judgment to test an affirmative defense, "[t]he defendant . . . must

demonstrate that no disputed material fact exists regarding the affirmative defense

asserted." Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir. 1997). Once the defendant

makes this initial showing, "the plaintiff must then demonstrate with specificity the

---

[6] Helm does not appeal the district court's denial of her motion for partial summary judgment or the district court's grant of summary judgment in favor of the State on her retaliation claim. Accordingly, the only issue before us is whether the district court properly granted summary judgment to the State on Helm's claim for sexual harassment.

existence of a disputed material fact." Id. If the plaintiff cannot meet this burden, "the affirmative defense bars [her] claim, and the defendant is then entitled to summary judgment as a matter of law." Id. In determining whether summary judgment is proper, we view the evidence in the light most favorable to the non-moving party. Duvall, 607 F.3d at 1259.

### III. DISCUSSION

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). It is well established that a supervisor's sexual harassment of a subordinate may constitute prohibited sex discrimination under Title VII. See generally Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64–67 (1986). Furthermore, actionable sexual harassment includes not only "economic or tangible discrimination" but also "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). In this case, the State concedes for purposes of summary judgment that Judge Stewart's alleged harassment of Helm was actionable. Therefore, the dispositive question in this appeal is whether the State may be held liable for that harassment.

The Supreme Court has recognized four different theories under which an employer can be held vicariously liable for the harassing conduct of a supervisor. See

12

Ellerth, 524 U.S. at 756–60; see also Harrison v. Eddy Potash, Inc., 158 F.3d 1371, 1375 (10th Cir. 1998) (listing the four theories of vicarious liability identified in Ellerth).[7] Helm relies on two of those theories in this case: (1) the alter-ego theory and (2) the misuse-of-delegated-authority theory. Accordingly, we pause here briefly to outline those theories, beginning with the alter-ego theory. We then proceed to address Helm's arguments.

The Supreme Court has "acknowledged an employer can be held vicariously liable under Title VII if the harassing employee's 'high rank in the company makes him or her the employer's alter ego.'" Harrison, 158 F.3d at 1376 (quoting Ellerth, 524 U.S. at 758); see also Faragher, 524 U.S. at 789 (recognizing that an employer can be held liable for sexual harassment by an individual "who [is] indisputably within that class of an employer organization's officials who may be treated as the organization's proxy"). But the Court has yet to examine the alter-ego theory in any detail, and the theory has received little attention in our case law. See Mallison-Montague v. Pocrnick, 224 F.3d 1224, 1232 (10th Cir. 2000) (noting "the absolute scarcity of case law development of this alternate avenue of employer liability"). Accordingly, the scope of the alter-ego theory remains relatively uncertain.

_____

[7] The Court has also indicated that an employer can be held directly liable for a supervisor's sexual harassment under certain circumstances. Ellerth, 524 U.S. at 758–59; see also Harrison, 158 F.3d at 1374–75. Helm does not contend that any of those circumstances exist in this case, so we need not delve into the different theories of direct liability.

The misuse-of-delegated-authority theory has been treated in much greater depth and is the theory under which most cases of supervisor sexual harassment are analyzed. The Supreme Court expounded this theory in the landmark cases of Burlington Industries, Inc. v. Ellerth and Faragher v. City of Boca Raton. In those cases, the Court determined that an employer should be held vicariously liable for a supervisor's harassment if the harassment was made possible by abuse of supervisory power. Faragher, 524 U.S. at 802–04; Ellerth, 524 U.S. at 759–60. The Court recognized, however, that virtually all sexual harassment by a supervisor involves misuse of supervisory authority, at least to some degree. Faragher, 524 U.S. at 802–04; see Ellerth, 524 U.S. at 763. Consequently, if interpreted too broadly, the misuse-of-delegated-authority theory could lead to automatic employer liability, a notion that the Court found problematic in light of its precedent and other considerations counseling in favor of limited liability for employers. See Faragher, 524 U.S. at 804, 806–07; Ellerth, 524 U.S. at 763–64. Thus, the Court adopted a liability scheme designed "to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 764.

Under the Faragher/Ellerth framework, an employer is subject to vicarious liability for actionable sexual harassment perpetrated by a supervisor with immediate (or successively higher) authority over the victimized employee in two situations. First,

14

"when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment," the employer is strictly liable and "[n]o affirmative defense is available." Faragher, 524 U.S. at 808; Ellerth, 524 U.S. at 765. Second, in the absence of a tangible employment action, the employer is liable unless it can prove an affirmative defense by a preponderance of the evidence. Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.

In this case, the district court granted summary judgment in favor of the State on Helm's sexual harassment claim based on the Faragher/Ellerth affirmative defense. Helm contends that this was error for three reasons: (1) Judge Stewart was the State's alter ego; (2) a reasonable jury could conclude that Judge Stewart's harassment "culminated" in Helm's termination, which would prevent the State from asserting the Faragher/Ellerth defense; and (3) genuine factual disputes exist with respect to both prongs of the defense. We consider these arguments in turn.

## A.      Helm's Alter-Ego Theory

Helm first argues that the Faragher/Ellerth defense is not available to the State because the harasser, Judge Stewart, was the State's alter ego. We have not squarely

15

addressed whether an employer may rely on the Faragher/Ellerth defense when a victimized employee seeks to impose liability on the employer under the alter-ego theory as opposed to the misuse of delegated authority. We need not decide that issue to resolve this case, however, as we conclude that Helm's argument fails for the reason that Judge Stewart did not operate as the alter ego of the State.

The contours of the alter-ego theory are not well defined. Nevertheless, the Supreme Court's decision in Faragher and our decisions in Harrison and Mallinson-Montague provide some guidance. In Faragher, the Supreme Court suggested that presidents, owners, proprietors, partners, corporate officers, and supervisors with a high position in the management hierarchy are the types of officials who can be considered an organization's alter ego. See 524 U.S. at 789–90. In Harrison, we stated that "a supervisory employee can[not] be considered an employer's 'alter ego' simply because he or she possesses a high degree of control over a subordinate." 158 F.3d at 1376. Thus, a "low-level supervisor" does not qualify. Id. at 1376 n.2. Finally, in Mallinson-Montague, we concluded that a bank's senior vice president of consumer lending held a sufficiently "high managerial rank" to qualify as the bank's alter ego. 224 F.3d at 1233. We relied on the following factors: the vice president (1) "had the authority to hire and fire employees in the consumer lending department"; (2) "was the ultimate supervisor of all employees in the department"; (3) "had the ultimate authority to disapprove all consumer loans"; (4) answered only to the bank's president; (5) held a "senior level title" that was regarded as "very important"; and (6) served on "committees exercising policy-

16

making functions." Id.

These cases indicate that an official must be high enough in the management hierarchy that his actions "speak" for the employer before he may be considered the employer's alter ego. Accord Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 384 (5th Cir. 2003) ("[T]he only factor relevant to the determination of whether [the former president and general manager] was a proxy for [the corporation] is whether he held a 'sufficiently high position in the management hierarchy' so as to speak for the corporate employer." (quoting Faragher, 524 U.S. at 789); Johnson v. West, 218 F.3d 725, 730 (7th Cir. 2000) (holding that the chief of police at a Veterans Affairs (VA) hospital was not the VA's alter ego because "he was not a high-level manager whose actions 'spoke' for the VA" (citing Harrison, 158 F.3d at 1376)). Only individuals with exceptional authority and control within an organization can meet that standard. Judge Stewart was not such an individual.

As an initial matter, we are aware of no cases in which a state district judge (or, for that matter, any state official) was deemed to be the alter ego of the state. Indeed, virtually every case addressing the alter-ego issue has arisen in the corporate context. Of course, this does not necessarily mean that a public official can never qualify as the alter ego of a government entity. But few public officials are vested with the same degree of power over a government entity as, for example, a corporate president has over a corporation. In this case, we need not meticulously define the narrow class of public officials who hold that kind of power, as it is clear that state district judges do not qualify.

17

State district judges do not exercise a sufficient degree of control over the myriad operations of the state. Rather, they operate in a limited sphere (the judicial branch) and perform a limited role (interpreting and applying the law that is enacted by other state officials). Furthermore, their decisions are subject to review and reversal by "higher ranking" state judges. For these reasons, state district judges, although they have considerable authority, do not occupy positions in the top echelons of the state's management. Nor does any state district judge speak for and represent the state. Indeed, the essential task of all judges is to be independent of the state, even to the extent of occasionally being asked to review the constitutionality or other legality of state actions. Therefore, the district court correctly determined that Judge Stewart was not the alter ego of the State of Kansas.

**B.      Whether Judge Stewart's Harassment "Culminated" in Helm's Termination**

We next address Helm's contention that the State may not assert the Faragher/Ellerth defense because she produced evidence that would allow a reasonable jury to conclude that Judge Stewart's harassment "culminated" in a tangible employment action—namely, her termination. Helm claims that the following evidence demonstrates that the decision to terminate her resulted from Judge Stewart's sexual harassment: (1) Chief Judge King's failure to report Helm's first mention of Judge Stewart's sexual harassment; (2) Judge Bednar's comment to Judge Stewart that Helm was complaining so that she could get money; (3) the fact that Helm was fired before she returned from medical leave; and (4) the fact that Ron Chance entered into a diversion agreement for a

18

DUI and was allowed to keep his job. Because Helm's evidence does not support an inference of a causal connection between Judge Stewart's harassment and Chief Judge King's subsequent termination decision, we reject Helm's argument.

There is no question that Helm's discharge constitutes a tangible employment action. Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1059 (10th Cir. 2009) (citing Ellerth, 524 U.S. at 761). But a plaintiff cannot show that a supervisor's harassment "culminated" in a tangible employment action merely by demonstrating that the tangible employment action followed the harassment. See id. Rather, the plaintiff must establish a strong causal nexus between the supervisor's harassment and the tangible employment action. See id. at 1059–61 (discussing two ways in which a plaintiff might show the requisite causal relationship); Johnson, 218 F.3d at 731.

Here, Helm has offered no evidence that connects Judge Stewart's harassment to Chief Judge King's termination decision. Indeed, it is undisputed that Judge Stewart removed himself from all employment decisions concerning Helm and played no role in the decision to fire her. Accordingly, Helm's "termination did not result from [Judge Stewart's] harassment in the way Ellerth and Faragher contemplate."[8] Johnson, 218 F.3d at 731. The district court was thus correct in its conclusion that the State could rely on the Faragher/Ellerth defense.

_____

[8] Helm has abandoned her retaliation claim in this appeal, so we do not address whether any of her evidence might have supported a separate and distinct claim that Chief Judge King retaliated against her because she complained about sexual harassment.

19

## C.    Application of the Faragher/Ellerth Defense

Having concluded that legally the Faragher/Ellerth defense is available to the State, we now turn to Helm's final argument, which is that even if the Faragher/Ellerth defense is legally available to the State, genuine issues of material fact preclude summary judgment.  As set forth above, to take advantage of the defense, the employer must factually demonstrate "(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.  We address these two factual elements of the defense in turn.

### 1.    Whether the State Exercised Reasonable Care to Prevent and Correct Promptly Any Sexually Harassing Behavior

The first element of the Faragher/Ellerth defense actually imposes two distinct requirements on an employer: (1) the employer must have exercised reasonable care to prevent sexual harassment and (2) the employer must have exercised reasonable care to correct promptly any sexual harassment that occurred.  See Pinkerton, 563 F.3d at 1062.  Helm contends that the State (acting through the First Judicial District) was unreasonable in both its prevention and correction efforts.  We disagree.

Beginning with the prevention requirement, courts have recognized that the existence of a valid sexual harassment policy is an important consideration in determining whether an employer acted reasonably to prevent sexual harassment.  See

20

id.; see also, e.g., Weger v. City of Ladue, 500 F.3d 710, 719–20 (8th Cir. 2007); Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1297–99 (11th Cir. 2000); Shaw v. AutoZone, Inc., 180 F.3d 806, 811–12 (7th Cir. 1999). Here, the record reveals that the State implemented a sexual harassment policy that prohibits sexual harassment, contains a complaint procedure and list of personnel to whom harassment may be reported, and includes an anti-retaliation provision. Helm does not challenge the facial effectiveness of this policy.

But mere promulgation of a sexual harassment policy that is reasonable on its face does not constitute an adequate preventative measure; the employer must also disseminate the policy. See Agusty-Reyes v. Dep't of Educ., 601 F.3d 45, 55 (1st Cir. 2010); Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1314–15 (11th Cir. 2001); see also Faragher, 524 U.S. at 808 (holding that the employer failed to exercise reasonable care to prevent harassment where, among other things, it "entirely failed to disseminate its policy against sexual harassment among [its] employees"). In this case, the State distributed its policy to employees via the Handbook and required employees to sign a form affirming that they had read and understood the policies in the Handbook. The State also provided training regarding the sexual harassment policy to management-level employees. According to Helm, these efforts to disseminate the policy were insufficient and rendered the State's preventative measures unreasonable. Specifically, Helm complains that the State buried its sexual harassment policy in the middle of a fifty-page employee handbook and did not provide training on the policy to non-management

21

employees. She also alleges that numerous employees, including herself, were completely unaware of the policy.

In our view, the State's efforts to prevent sexual harassment, while perhaps not as comprehensive as Helm would have liked, were nonetheless reasonable. Numerous courts have held that employers acted reasonably as a matter of law when they adopted valid sexual harassment policies, distributed those policies to employees via employee handbooks, and either provided no sexual harassment training or provided training only to managers. See, e.g., Dearth v. Collins, 441 F.3d 931, 935 & 936 n.5 (11th Cir. 2006) (per curiam); Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 265, 268 (4th Cir. 2001); Kohler v. Inter-Tel Techs., 244 F.3d 1167, 1180 (9th Cir. 2001); Shaw, 180 F.3d at 811–12; cf. Thornton v. Fed. Express Corp., 530 F.3d 451, 456–57 (6th Cir. 2008) (stating that an effective sexual harassment policy should, among other things, provide for training regarding the policy, but then observing that there was no dispute regarding the reasonableness of the employer's prevention efforts where the employer distributed its policy via an employee handbook and the plaintiff received more than one copy of the handbook during her employment). The Seventh Circuit's decision in Shaw v. AutoZone, Inc. is particularly instructive given the similarities between that case and this one. There, the employer adopted a facially valid sexual harassment policy that it distributed to all of its employees via an employee handbook. 180 F.3d at 811. Additionally, the employer provided training to management-level employees regarding the policy. Id. at 812. The Seventh Circuit concluded that these facts established, as a

22

matter of law, that the employer exercised reasonable care to prevent sexual harassment.

Id.  Notably, the court found "irrelevant" the plaintiff's testimony that she was unaware

of the employer's sexual harassment policy.  Id. at 811.  Like Helm, the plaintiff in Shaw

signed an acknowledgement form stating that she understood that it was her

responsibility to read and understand the policies contained in the employee handbook.

Id.  Accordingly, the court reasoned that "even if [the plaintiff] did not have actual

knowledge of the policy, she had constructive knowledge of the anti-harassment policy."

Id.

We agree with Shaw and the other cases cited above.  Therefore, we conclude that

the State exercised reasonable care to prevent sexual harassment by promulgating an

appropriate sexual harassment policy, distributing that policy to all employees via an

employee handbook, requiring employees to acknowledge in writing their understanding

of the policies contained in the handbook, and providing training to managers regarding

the sexual harassment policy.[9]  Although the State could have made a stronger effort to

---

[9] Helm's arguments regarding alleged widespread ignorance of the sexual harassment policy do not convince us otherwise.  For starters, Helm is deemed to have had knowledge of the policy by virtue of her signing the acknowledgment form after she received and reviewed her Handbook.  See Shaw, 180 F.3d at 811.  Furthermore, we give no weight to Helm's conclusory allegations regarding the knowledge of several of her coworkers.  In her opening brief, Helm claims that she "told several employees about Judge Stewart's sexual harassment, including Karen Connor, Estella Sullivan, [and] Larry Thibault, yet none of them suggested she make a formal complaint, presumably because none of them had training about the availability and requirement of the complaint procedure."  (Aplt. Br. at 36.)  This sort of naked speculation is insufficient to create a triable issue of fact.  See Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th

Continued . . .

23

disseminate its sexual harassment policy by providing training to non-management employees and/or by publishing the policy more prominently, the relevant question "is not whether any additional steps or measures would have been reasonable if employed, but whether the employer's actions as a whole establish a reasonable mechanism for prevention." Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1177 (9th Cir. 2003).

Turning to the correction requirement, it is clear that an employer's mere promulgation and dissemination of an adequate sexual harassment policy does not, by itself, establish that the employer acted reasonably to remedy any harassment that occurred despite the reasonable preventative measures. See Pinkerton, 563 F.3d at 1062; see also Cerros v. Steel Techs., Inc., 398 F.3d 944, 953 (7th Cir. 2005); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 188 (4th Cir. 2001) ("[A] jury could rationally conclude that, although [the employer's] institution of an anti-harassment policy represented a reasonable step toward preventing the type of abuse suffered by [the

_____

Cont.

Cir. 2004) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings."). Finally, Helm's claim that Larry Thibault, a thirty-year employee of the First Judicial District and Judge Stewart's former court reporter, was utterly ignorant of the sexual harassment policy until his deposition in this case is contradicted by the record. Thibault specifically testified that he knew that unwanted touching would violate the sexual harassment policy. Although Thibault also testified that he was unaware of an affirmative obligation to report known instances of sexual harassment, evidence that one employee was not familiar with every detail of a sexual harassment policy does not, without more, create a genuine issue of fact regarding the reasonableness of an employer's prevention efforts.

employee], the company unreasonably failed to correct [the supervisor's] offending behavior by neglecting to enforce the policy."). Rather, in order "to establish that it took proper action to correct harassment, [the State] was required to show that it acted reasonably promptly on [Helm's] complaint when it was given proper notice of her allegations as required under its complaint procedures." Frederick, 246 F.3d at 1314. "The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." Swenson v. Potter, 271 F.3d 1184, 1192 (9th Cir. 2001); see also Cerros, 398 F.3d at 954 ("Our cases recognize prompt investigation of the alleged misconduct as a hallmark of reasonable corrective action.").

Helm argues that the State failed to act reasonably to correct Judge Stewart's sexual harassment because Chief Judge King did not initiate an investigation into Helm's first complaint about Judge Stewart. According to Helm, Chief Judge King neglected to follow the sexual harassment policy, which expressly provides that all sexual harassment complaints will be taken seriously and promptly investigated. We find Helm's argument unpersuasive.

The record indicates that Helm first approached Chief Judge King in late June or early July 2007 and told him that Judge Stewart had done something inappropriate and made her feel uncomfortable. But Helm provided absolutely no details about Judge Stewart's conduct, nor does the record suggest that Helm even mentioned sexual harassment. As we recognized above, "the question of whether [the State] timely acted to

25

correct harassment turns on when it had <u>proper notice</u> of [Helm's] harassment complaint." <u>Frederick</u>, 246 F.3d at 1315 (emphasis added); <u>see also</u> <u>Swenson</u>, 271 F.3d at 1192 ("<u>Notice</u> of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is reasonably calculated to end the harassment." (emphasis added) (internal quotation marks omitted)). In our view, Helm's vague complaint did not constitute adequate notice that would have triggered Chief Judge King's duty to take corrective action. <u>See</u> <u>Madray</u>, 208 F.3d at 1300 (holding that an employee's complaint to a manager that a supervisor's behavior made her sick was too "informal" and "general" to put the manager on notice of the need to take corrective action).

Furthermore, even if Chief Judge King had some obligation to take action, which he did not, no reasonable jury could conclude that Chief Judge King acted unreasonably in response to Helm's amorphous complaint. Chief Judge King advised Helm of the procedure for making a formal complaint and assured Helm that she had the full support of the First Judicial District. He also informed Helm that he was required to report all incidents of sexual harassment. Nevertheless, when Helm returned to Chief Judge King later that same day and told him that she did not wish to pursue her complaint because she had spoken with Judge Stewart and resolved the matter, Chief Judge King respected her wishes. Although this decision may have been inconsistent with the letter of the State's harassment policy, which indicates that all sexual harassment complaints will be investigated, it was entirely reasonable under the circumstances. <u>Cf.</u> <u>Brown v. Perry</u>, 184 F.3d 388, 396 (4th Cir. 1999) (holding that supervisors who violated the employer's

26

directive that all sexual harassment be reported nonetheless acted reasonably because they (1) "were confronted with a victim who has continuing to work effectively and . . . who reported a single incident of harassment perpetrated by a supervisory employee with whom she would have very limited future contact"; (2) "offer[ed] immediate unconditional support to the victim," (3) suggested that the victim speak with an Equal Employment Opportunity officer; and (4) declined to report the victim's sexual harassment complaint only after she requested that they not pursue the matter).

Importantly, when Helm made specific allegations of sexual harassment to Judge Bednar in August 2007, Judge Bednar immediately contacted Chief Judge King and Steven Crossland, who reported the complaint to the OJA the same day. The OJA coordinated with the KCJQ and quickly began an investigation that resulted in disciplinary proceedings against Judge Stewart. Additionally, Crossland made plans to reassign Helm's duties so that she would not have to work for Judge Stewart when she returned from medical leave. Crossland also told Helm that her complaint would be investigated, that her job was safe, and that they would discuss changing her duties when she returned. These actions clearly constitute reasonable efforts to correct promptly Judge Stewart's harassing behavior.

Because the undisputed facts demonstrate that the State acted reasonably to prevent and correct promptly Judge Stewart's sexually harassing behavior, the district court correctly determined that the State satisfied its summary-judgment burden with respect to the first prong of the Faragher/Ellerth defense. We now turn to the second

27

prong of the defense.

**2.      Whether Helm Unreasonably Failed to Take Advantage of Preventive or Corrective Opportunities or to Avoid Harm Otherwise**

An employer may satisfy the second element of the <u>Faragher/Ellerth</u> defense by showing that the victimized employee unreasonably delayed in reporting incidents of sexual harassment.  <u>See</u> <u>Pinkerton</u>, 563 F.3d at 1063 (holding that an unexplained delay of two or two and a half months was unreasonable).  Here, the district court determined that Helm acted unreasonably by waiting until the middle of 2007 to report Judge Stewart's sexual harassment, which had been ongoing for several years.  On appeal, Helm's offers only one excuse for the delay: her alleged lack of knowledge of the State's sexual harassment policy.  But as we explained above, because Helm signed a form acknowledging that she had read and understood the policies contained in the Handbook, she had at least constructive knowledge of the sexual harassment policy.  <u>See</u> <u>Shaw</u>, 180 F.3d at 811.  Therefore, her ignorance argument is unavailing, and we have no basis on which to disturb the district court's conclusion that the State carried its burden on the second prong of the <u>Faragher/Ellerth</u> defense.

Because the State has shown that no genuine issues of material fact exist regarding the reasonableness of its preventive and corrective measures and the unreasonableness of Helm's mitigation efforts, the district court properly granted summary judgment in favor of the State on Helm's sexual harassment claim.

**D.      Motions to Seal Portions of the Appendices**

28

Finally, we turn to the parties' motions to seal portions of their respective appendices. Helm seeks to seal five volumes of her six-volume appendix, while the State seeks to seal one volume of its two-volume appendix. The Clerk of this Court provisionally granted the parties' motions, leaving the ultimate decision to this panel. We now deny both motions to seal.

Although "[c]ourts have long recognized a common-law right of access to judicial records,"[10] this right "is not absolute." Mann v. Boatright, 477 F.3d 1140, 1149 (10th Cir. 2007). Accordingly, this Court, "in its discretion, may seal documents if the public's right of access is outweighed by competing interests." United States v. Hickey, 767 F.2d 705, 708 (10th Cir. 1985) (internal quotation marks omitted). "In exercising this discretion, we weigh the interests of the public, which are presumptively paramount, against those advanced by the parties." Crystal Grower's Corp. v. Dobbins, 616 F.2d 458, 461 (10th Cir. 1980). "The party seeking to overcome the presumption" of public access to the documents "bears the burden of showing some significant interest that outweighs the presumption." Mann, 477 F.3d at 1149 (internal quotation marks omitted).

In support of their motions to seal, the parties allege only that the portions of the volumes of the appendices that they wish to seal contain confidential discovery materials

---

[10] Although this common-law right has long been recognized, "[t]he Supreme Court has not yet ruled on 'whether there is [also] a constitutional right of access to court documents and, if so, the scope of such a right.'" United States v. Gonzales, 150 F.3d 1246, 1256 (10th Cir. 1998) (quoting United States v. McVeigh, 119 F.3d 806, 812 (10th Cir. 1997) (per curiam)).

that are subject to a stipulated protective order entered by the district court on January 14, 2009. Even assuming, however, that the district court's protective order is valid and has continuing effect in that court, the order cannot limit our authority to decide whether the parties may file documents under seal in this Court. See Dobbins, 616 F.2d at 461 ("It is beyond question that this Court has discretionary power to control and seal, if necessary, records and files in its possession."). Moreover, the parties cannot overcome the presumption against sealing judicial records simply by pointing out that the records are subject to a protective order in the district court. Rather, the parties must articulate a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process. Because the parties have not come close to meeting that heavy burden, we deny the motions to seal.

## IV. CONCLUSION

For the foregoing reasons, we hold that the Faragher/Ellerth defense shields the State of Kansas from liability for Judge Stewart's alleged sexual harassment of Helm. Accordingly, we AFFIRM the district court's grant of summary judgment in favor of the State. We also DENY both parties' motions to seal certain volumes of their respective appendices.