FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**September 30, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

YOLANDA EVERT, individually and as
the qualified wrongful death
representative of Erwin Evert, deceased,

       Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

       Defendant-Appellee.

No. 12-8090
(D.C. No. 2:11-CV-00339-NDF)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **EBEL**, Circuit
Judge.

Yolanda Evert brought this action against the United States under the Federal

Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA"), after her husband

Erwin Evert was fatally mauled by a grizzly bear in the Shoshone National Forest.

The district court granted summary judgment in favor of the United States, reasoning

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

that the Wyoming Recreational Use Act, Wyo. Stat. §§ 34-19-101 to 107 ("WRUA"),

barred her claims. On appeal Ms. Evert contends that the district court erred in

finding that the WRUA applied under the circumstances of her case. She further

argues that even if the WRUA applies, the government's conduct falls within an

exception to the WRUA's limitation of liability that applies when a land owner has

engaged in a "willful or malicious failure to guard or warn against a dangerous

condition, use, structure, or activity[.]" *Id.* § 34-19-105(a)(i). Because the district

court correctly determined that the WRUA applied, and because Ms. Evert has failed

to demonstrate a genuine issue of fact concerning whether the United States willfully

or maliciously failed to guard or warn Mr. Evert, we affirm the grant of summary

judgment.

## BACKGROUND

The Interagency Grizzly Bear Study Team (IGBST) is a study team composed

of members from a number of state and federal agencies charged with monitoring

grizzly bears in the Greater Yellowstone ecosystem. On May 27, 2010, IGBST

researchers Chad Dickinson and Seth Thompson began grizzly-bear-trapping

operations in the Kitty Creek drainage area in the Shoshone National Forest. They

established three trap sites within the drainage. These sites were located on or

adjacent to decommissioned spur roads formerly used for logging. Site #3, at which

Mr. Evert was fatally mauled, was created on June 12, 2010.

Near the bottom of the Kitty Creek drainage are private cabins authorized under Forest Service permits, including the cabin owned by Mr. and Ms. Evert, who had lived there seasonally for 40 years. Mr. Evert was a botanist who enjoyed hiking throughout the Yellowstone ecosystem. He and his wife hiked the trails and decommissioned roads in the Kitty Creek drainage.

Although most roads in the area were closed, obliterated, and reseeded in 1999 to provide grizzly-bear habitat, the Forest Service maintains a trail in the Kitty Creek drainage, trail #756, known as the "Kitty Creek Trail." Trail #756 runs on top of a decommissioned road for approximately one tenth of a mile before it diverges from the road and then runs parallel to it.

To reach trap Site #3 from the cabin area, one could take two routes: (1) travel approximately one mile on Forest Service trail #756, then turn west on a decommissioned spur, walk up a steep hill, and travel for another half-mile; or (2) travel on the parallel decommissioned road for nine-tenths of a mile and then turn onto the same decommissioned spur. The decommissioned spur contained impediments to hiking, including "dirt berms, trees growing up, and deadfall." Aplt. App., Vol. I, tab 11 at 81.

To warn the public of grizzly-bear-trapping operations in the Kitty Creek drainage during May and June 2010, the IGBST researchers placed signs in the vicinity of each trap site. They placed five signs near Site #3, three of them along the decommissioned spur. These signs read: "DANGER! BEAR TRAP IN THE AREA.

THE AREA BEHIND THIS SIGN IS TEMPORARILY CLOSED.  THE CLOSURE IS EFFECTIVE FROM 6-11-10 TO 6-20-10."  The IGBST researchers made no other specific effort to notify Kitty Creek residents of the trapping operation, even though a Forest Service employee had recommended that they inform residents of their trapping activities.

As of June 16, there were three snares set at Site #3.  The IGBST researchers used bait to lure bears to the trap sites.  Being caught in a snare trap is a traumatic event that can cause a grizzly bear to become severely stressed and to react aggressively.

On the morning of June 17, having finished their work at Kitty Creek, the IGBST researchers traveled to the trap sites on horseback, planning to dismantle the sites before they returned home.  As they approached Site #3, they heard and then saw grizzly bear #646 caught in the snare trap.  Bear #646 was later found to be an adult male grizzly bear weighing 425 pounds.  As they came closer, the bear charged them, tried to get away, and bit on the snare cable.

Mr. Dickinson immobilized bear #646 with three separate doses of an anaesthetic, Telazol.  The last dose was administered before 10:00 a.m.  The IGBST then removed a tooth from the bear, tattooed its lips, tagged both ears, and collared the bear.  The bear first showed signs of recovery from the anesthetic at about 10:50 a.m.  When the two researchers left Site #3 at 12:30 p.m., bear #646 had held its head up but had only partially recovered from the anesthetic and was still at the

site. Before they left, the researchers removed the snares, cleaned up the bait, and removed signs warning hikers of the bear trap.

At approximately 12:45 p.m., Mr. Evert left his cabin for a hike in Kitty Creek. He approached Site #3 and was fatally mauled by bear #646. Mr. Dickinson later found his body approximately 21 yards from where bear #646 had been left to recover from anesthetic.

Ms. Evert subsequently filed her complaint for wrongful death as the personal representative of Mr. Evert's estate. The United States moved to dismiss Ms. Evert's complaint under the WRUA, arguing that Mr. Evert was present in the Shoshone National Forest for a "recreational purpose," and that he had not been charged a fee to engage in hiking activities in the Forest. In denying the motion to dismiss, the district court rejected Ms. Evert's arguments that the WRUA did not apply, but ruled that she had demonstrated a sufficient issue concerning whether her case fell within an exception to the WRUA, based on the government's "willful or malicious failure to guard or warn" Mr. Evert, to survive a motion to dismiss.

After further discovery, the government moved for summary judgment, again arguing that the WRUA immunized it from liability and that the "willful or malicious" exception did not apply. The district court agreed with the government that the WRUA exception was inapplicable, and granted it summary judgment on this basis.

## ANALYSIS

We review the district court's order of summary judgment de novo, applying the same standard that the district court should apply. *See Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In conducting the analysis, we "view[ ] all facts [and evidence] in the light most favorable to the party opposing summary judgment." *Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

The FTCA makes the United States liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Under this measure of liability, the United States is entitled, like a private landowner, to assert the protections afforded by state recreational use statutes. *See Klepper v. City of Milford*, 825 F.2d 1440, 1444 & n.5 (10th Cir. 1987).

### 1. Applicability of WRUA

The WRUA provides in pertinent part that "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on such premises to persons entering for recreational purposes." Wyo. Stat. § 34-19-102. It further states that

> an owner of land who either directly or indirectly invites or permits without charge any person to use the land for recreational purposes or a lessee of state lands does not thereby:

- 6 -

(i) Extend any assurance that the premises are safe for any purpose;

(ii) Confer upon the person using the land the legal status of an invitee or licensee to whom a duty of care is owed;

(iii) Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of the person using the land.

*Id.* § 34-19-103.

As noted, the district court concluded in response to the United States' motion to dismiss that the WRUA applied in this case. Ms. Evert contests this ruling on several bases. We address her arguments in turn.

**A. Study Site as "Recreational Land"**

Section 34-19-103 requires that the "land" in question be used "for recreational purposes." Ms. Evert argues that Site #3 did not meet this WRUA qualification, because it was a "closed scientific research area where a grizzly bear was still recovering." Aplt. Opening Br. at 15. She contends that the work of the IGBST and the temporary presence of bear #646, together with the closure order and signs, removed the study site from qualifying as what she calls "recreational land." *Id.* at 15.

But the WRUA refers not to "recreational land," but simply to "land." *See* Wyo. Stat. § 34-19-101(a)(i).[1] It is the permission granted to use such land for

---

[1] In *Bingaman v. Kansas City Power & Light Co.*, 1 F.3d 976, 979-80 (10th Cir. 1993), construing a similar Kansas recreational use act that referred to use of "land" for "recreational purposes," we characterized the defendants' property as "public

(continued)

- 7 -

recreational purposes without charge that immunizes the landowner. *See id.* §§ 34-19-102, 34-19-103(a). It cannot be questioned that that the Kitty Creek drainage was "land" generally open to the public for recreational purposes, or that Mr. Evert's hiking was such a recreational purpose, *id.* § 34-19-101(a)(iii) (defining "[r]ecreational purpose" to include "hiking"), a fact that Ms. Evert admits.

Ms. Evert contends, however, that the focus should neither be on Mr. Evert's recreational activity nor on the general use of the drainage. Instead, she focuses on the particular suitability of the land for recreational purposes on the day Mr. Evert was mauled. *See* Aplt. Opening Br. at 17 ("The Government conceded Site #3 was neither *a suitable recreational area* for the public [n]or land properly available for recreational purposes *on June 17, 2010, while Bear #646 remained present*." (emphasis added)). For this proposition, she cites *Holland v. Weyher/Livsey Constructors, Inc.*, 651 F. Supp. 409 (D. Wyo. 1987).

The facts of *Holland* differ significantly from those of our case. In *Holland* an eleven-year-old child played on "an abandoned pile of coal tailings in which subsurface fires smoldered" and was seriously burned when he broke through the surface. *Id.* at 411. Several of the defendants argued that the WRUA applied because the child had entered the land to hike and to play on the tailings pile.

---

recreational land." Ms. Evert does not argue that use of this phrase in a prior case is somehow binding on us here.

The district court disagreed, noting that the tailings "were located in an industrial subdivision, not on recreational land." *Id.* at 412.

In *Holland*, although the industrial subdivision met the broad definition of "land" contained in Wyo. Stat. § 34-19-101(a)(i), and was being used for a "recreational purpose," the District of Wyoming found an additional requirement implicit in the WRUA analysis: the land must be "recreational land," *Holland*, 651 F. Supp. at 412, or as Ms. Evert puts it, "a suitable recreational area," Aplt. Opening Br. at 17. We have located no Wyoming case imposing this suitability requirement. But even if it can be read into the statute, it cannot defeat the application of the WRUA here.[2]

Although Wyoming case law gives us little to go on concerning this point, persuasive authority is available in other jurisdictions.[3] In particular, the New York courts, interpreting their similar statute, *see* N.Y. Gen. Oblig. Law § 9-103 (McKinney 1984), have extensively discussed the parameters of a "suitability" requirement similar to that contended for by Ms. Evert. They have concluded that

---

[2]    The other case Ms. Evert cites, *Yalowizer v. Husky Oil Co.*, 629 P.2d 465, 469 (Wyo. 1981), which found the WRUA inapplicable to injuries suffered by a woman driving through an abandoned service station, contained no analysis on this point and cannot be read to impose a suitability requirement.

[3]    In *Klepper*, 825 F.2d at 1446, we cautioned against the use of other states' laws to interpret the term "willful" as used in Kansas's recreational use statute, holding that Kansas law, not that of other states, controlled our analysis. But given that Wyoming has not yet grafted a "suitability" requirement into its recreational use statute, there is no governing Wyoming law on this topic. Resort to the law of other jurisdictions is therefore useful to us here.

temporary conditions and isolated hazards (like the research closure or the presence of grizzly bear #646) do not make land "unsuitable" under its recreational-use statute. We find the reasoning of the New York courts on this topic highly persuasive, and conclude that if the Wyoming courts were to adopt a suitability requirement, they would as well.

In *Bragg v. Genesee County Agricultural Society*, 644 N.E.2d 1013 (N.Y. 1994), for example, the plaintiff was riding his motorbike on an abandoned railway bed when he drove into a ten-foot-deep excavation pit and was injured. Off-road vehicles had used the railway bed for recreational purposes for some time before the pit was excavated. The contractor, who excavated with the landowner's permission, had erected no warning signs. The question was whether New York's recreational use statute applied to the railway bed, notwithstanding its alleged "unsuitability" for motor-biking at the time of the accident. The New York Court of Appeals held that it did:

> The [recreational use] statute removes any obligation on the landowner to keep the premises safe and to give warning of any hazardous condition to persons entering for recreational purposes. If this language is to have any force, suitability [for recreational use] must be judged by *viewing the property as it generally exists, not portions of it at some given time*. Any other test, which requires the owner to inspect the land, to correct temporary conditions or locate and warn of isolated hazards as they exist on a specific day, would vitiate the statute by reimposing on the owner the common-law duty of care to inspect and correct hazards on the land.

*Id.* at 1018 (citation, internal quotation marks, and alterations omitted) (emphasis added). *See also Morales v. Coram Materials Corp.*, 853 N.Y.S.2d 611, 617

- 10 -

(N.Y. App. Div. 2008) ("Where property is suitable for recreational use at most times, but is temporarily unsuitable on the date of a plaintiff's accident, the immunity of [the Recreational Use Statute] applies to the landowner, as the issue of suitability is measured against how the property generally exists rather than upon temporary hazards that exist on a particular day. . . ."); *Albright v. Metz*, 672 N.E.2d 584, 588 (N.Y. 1996) (same).

This case is more like *Bragg*, in which a temporary hazard was present on premises otherwise "suitable" for recreation, than *Holland*, in which the court implicitly found an industrial area *never* to be suitable for recreation. The Kitty Creek drainage was *generally* suitable for recreational purposes, including hiking. Part of it was made "unsuitable" only by a temporary hazard: the presence of bear #646. Assuming the Wyoming courts would recognize a "suitability" requirement, this temporary "unsuitability" did not remove the land in question from the WRUA.

### B. "Invitation or Permission" to Use Land

Under § 34-19-103, a landowner must "either directly or indirectly invite[] or permit[]" use of his land to benefit from the protections of the WRUA. Ms. Evert contends this requirement was not satisfied because the IGBST posted signs closing to the public the area containing the bear traps. These signs, however, announced only a temporary closure and had actually been removed by the time Mr. Evert was mauled.

These facts distinguish this case significantly from the case Ms. Evert cites for this point, *Bingaman v. Kansas City Power & Light Co.*, 1 F.3d 976 (10th Cir. 1993). In *Bingaman* we held that the plaintiff had created a genuine issue of material fact concerning whether the Kansas Recreational Use Statute applied, where the plaintiff's husband drowned in a weir that the defendants had *permanently* excluded from recreational use by marking it off with a series of rope-buoys, and by patrolling the area with security personnel who removed fishermen and boaters found in the area. By contrast, the presence of temporary signage here, which had been removed by the time of Mr. Evert's accident, was insufficient to create a genuine issue of material fact concerning whether the public was invited or permitted to use the Kitty Creek drainage for recreational purposes.

### C. Other Arguments

Ms. Evert also argues that the WRUA does not apply because the defendants "knowingly created an unnatural, hidden peril on the land," Aplt. Opening Br. at 19, in violation of their common-law duties, and that the WRUA should be strictly construed because it was enacted in derogation of the common law. But the purpose of the WRUA is to limit common-law liability. *See Yalowizer v. Husky Oil Co.*, 629 P.2d 465, 469 (Wyo. 1981) (noting WRUA's purpose is "to encourage landowners to make land and water areas available to the public *by limiting liability in connection therewith*" (emphasis added) (internal quotation marks omitted)). Notwithstanding her argument concerning a landowner's common-law duty to refrain

- 12 -

from creating or aggravating a naturally existing condition, the WRUA imposes only a lesser duty to avoid a "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity," Wyo. Stat. § 34-19-105(a)(i). Ms. Evert's proposed rule would defeat the purpose of the WRUA.[4]

In sum, we affirm the district court's conclusion that the WRUA applies under the facts of this case.

### 2. "Willful or Malicious Failure" Exception

Alternatively, Ms. Evert argues that she has demonstrated a genuine issue of material fact concerning whether the WRUA's "willful or malicious failure to warn" exception applies here. She begins her analysis by arguing that the district court misconstrued Wyoming law in developing its test for willfulness.[5] We need not consider the specific alleged errors of state law she raises. It is sufficient if we ourselves correctly apply the governing Wyoming law as part of our de novo review of the summary-judgment decision. *See Salve Regina College v. Russell*, 499 U.S.

---

[4] In support of her argument, Ms. Evert cites this passing remark in *Holland*: "The legislature intended to increase access to Wyoming's recreational areas, not to permit landowners to lay traps for the public and then claim immunity under the Act." *Holland*, 651 F. Supp. at 412. This remark, which added little to the court's analysis in *Holland*, is not binding on us, and we decline Ms. Evert's invitation to use it as a basis for finding a common-law duty here.

[5] We note that Ms. Evert has alleged only that the failure to guard or warn was "willful," not "malicious"; accordingly, we confine our review to the issue of willfulness.

225, 231 (1991) ("[A] court of appeals should review *de novo* a district court's determination of state law.").

Under Wyoming law, as Ms. Evert acknowledges, the definition of *willfulness* required her to show that the government's acts or omissions were

> such as [were] done purposely, with knowledge-or misconduct of such a character as to evince a reckless disregard of consequences. . . . In order to prove that an actor has engaged in willful misconduct, one must demonstrate that he acted with a state of mind that approaches intent to do harm. State of mind, of course, may be difficult to prove. Accordingly, courts allow a party to establish that willful misconduct has occurred by demonstrating that an actor has intentionally committed an act of unreasonable character in *disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow.*

*McKennan v. Newman*, 902 P.2d 1285, 1286 (Wyo. 1995) (internal citations and quotation marks omitted) (emphasis added); *accord Yalowizer*, 629 P.2d at 470 n.6.

Ms. Evert does not contend that the researchers intended to harm her husband. She properly relies on an objective test of willfulness. Under that test, liability is established if (intentional) action is taken when a reasonable person would know or have reason to know that there was a high probability that harm would follow. *See Bertagnolli v. Louderback*, 67 P.3d 627, 632 (Wyo. 2003).

Having clarified the applicable law, we now consider its application to the facts of this case. The burden on Ms. Evert is to prove that a reasonable person possessing the knowledge of Dickinson and Thompson at the time they left Site #3 would have known that it was "highly probable" that someone would be harmed because of the increased danger posed by bear #646 before it recovered from the

- 14 -

anesthetic.  We are concerned with only the *increase* in the danger because the presence of grizzly bears in the area always created some danger and Ms. Evert has not argued that it was necessary to warn hikers of that danger.

Ms. Evert emphasizes the government's actual knowledge of the dangers associated with a grizzly bear that has been trapped, anesthetized, and released while recovering from anesthetic, without a warning to the public.  But the record contains insufficient evidence to support the remainder of what she must prove:  that it was highly probable that this danger would result in harm to someone in the circumstances present here.  In particular, one could not reasonably infer a high probability that a hiker would enter Site #3 before the bear recovered from the anesthetic.  The recovery time was likely to be short and it was unlikely that anyone would enter the site, particularly when the weather was inclement.

The government presented evidence that at the time the IGBST team left Site #3, bear #646 was already recovering from the anesthetic and was expected to complete a full recovery soon.  Ms. Evert contests this conclusion, noting testimony from the two researchers that it is possible that a bear may "go back to sleep . . . to recover fully from the anesthesia," Aplt. App., Vol. I, tab 14 at 125, and that bear #646 had not yet showed signs that he was going to stand up when the researchers left, *id.*, tab 8 at 60.  Nevertheless, the parties appear to agree that the bear would probably have recovered within another two hours.

What, then, was the probability that a hiker would enter Site #3 within that two-hour window? Ms. Evert points out that the site "was less than three-quarters of a mile (3700 feet) in a straight-line distance from the recreational cabins and less than one-third of a mile (1700 feet) in a straight-line distance from the Kitty Creek trail." Aplt. Opening Br. at 46. These distances, however, are a poor measure of the difficulty of hiking from the cabins to the site. In particular, as the district court noted, the hiking distance to the site from the Kitty Creek Trail was about one-half mile; was on a decommissioned spur with "boulders, dirt berms, trees growing, and deadfall in the middle of the spur," Aplt. App., Vol. II, tab 29 at 209, and required climbing a steep hill. More importantly, the issue is not whether a hiker *could* have hiked to the site from the cabins, but how likely it would be for a hiker to do that.

In that regard, the researchers reported that during their three weeks in the Kitty Creek area they had not seen any hikers other than on the Kitty Creek trail or the decommissioned trail that parallels it. That is, to use the district court's term, they saw no hikers "off-trail." Ms. Evert raises three challenges to this point.

First, she notes that the IGBST team had three relevant encounters with hikers or horseback riders while conducting trapping operations in the Kitty Creek drainage. But these encounters did not occur "off-trail." The group of riders from a nearby dude ranch met the study team on the decommissioned road running parallel to the Kitty Creek Trail. Hikers also met the study team twice on this decommissioned road.

Second, Ms. Evert argues that the reason the IGBST members did not encounter more hikers was because the warning signs kept them away. She cites no evidence to support her argument, other than a hearsay statement that Mr. Evert himself told his wife that when he saw one of the signs initially, he turned around and headed for home. In any event, the team members' observation that hikers were not traveling off-trail was not limited to the three sites with warning signs.

Third, Ms. Evert asserts that a genuine issue of material fact remains concerning the credibility of the IGBST researchers. She argues that one of the three encounters did not occur at the location claimed by the IGBST researchers. But any dispute about the precise location of this encounter is inconsequential, because all agree that it was not "off-trail." She also asserts that the testimony of other witnesses established that the public made significant use of the Kitty Creek trails in May and June 2010, despite the IGBST team's assertion to the contrary. These differences, however, are also immaterial to the essential issue—that is, whether hikers frequently traveled off-trail in the area.

The only reasonable conclusion is that, based on the information known to the researchers, the inaccessibility of Site #3 made it highly unlikely that a hiker would enter the site during the relatively brief time before the bear recovered from the anesthetic. Moreover, the weather conditions at the time decreased the likelihood still further. The temperature was below 42 degrees and average winds were 15 to 20 miles per hour. According to Ms. Evert's testimony, when her husband was leaving

he put on a coat and wool hat because it was snowing, he put on a scarf so he would not get cold, and he decided also to wear gloves. Of course, people who love the outdoors may decide to hike in much worse weather than was present that day. But such weather hardly increases the population of hikers.

Finally, Ms. Evert complains about the district court's statements concerning Mr. Evert's intent and argues about the motives of the researchers in leaving Site #3 before the bear had fully recovered from the anesthetic. We need not address those matters, however, because they are irrelevant to whether there was a high probability of harm in removing the warning signs before the bear recovered.

Thus, Ms. Evert failed to establish for summary-judgment purposes that the government disregarded a known or obvious risk that made it highly probable that harm would follow. As we have explained, disregard of such a known or obvious risk is a requirement of willful misconduct under Wyoming law.

## CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court


Harris L Hartz
Circuit Judge